THE STATE OF FLORIDA, *ex. rel.,* RAILROAD COMMISSIONERS, *Relators,* v. THE FLORIDA EAST COAST RAILROAD COMPANY, *Respondent.*

Opinion Filed April 20, 1915.

1. A railroad company has a right to load or unload its cars where its facilities or appliances for such work are, and may not be required to establish other facilities for such purpose to accommodate each patron.

2. A carrier which renders an additional service to shippers or consignees in carrying freight from or to warehouses or points on private or industrial side-tracks for shipment or delivery is entitled for such service to reasonable compensation.

3. Rule 15 of the rules governing the transportation of freight formulated and prescribed by the Railroad Commissioners prohibiting, among other things, any charge whatever by a "railroad having the line haul, for placing for unloading an empty car at any warehouse or other point on its own line or side-track, or for switching the loaded car to or from the same either for delivery or transportation" is valid upon its face, and a carrier which resists its enforcement has the burden of proving that the rule operates to deny the carrier a reasonable compensation for a special or additional service.

4. The service of delivering freight to consignees in carloads on private or industrial sidings is a service which may not in the present state of the law be required of railroads, nor is it a service which is forbidden. If the service is of benefit to the patron of the road and involves some service and expense to the railroad, and forms no part of the transportation or haul, but is in addition thereto, the railroad is entitled to charge for the service, and such charge may not be confined to the actual cost of it.

This is a case of original Jurisdiction in the Mandamus.

Peremptory writ denied.

*F. M. Hudson*, for Relators;

*Alex St. Clair-Abrams*, for Respondent.

Ellis, J.—An alternative writ of mandamus was issued in this cause, requiring respondent to observe and obey Rule 15 of the Rules Governing the Transportation of

Freight Prescribed by the Railroad Commissioners of Florida in this: "That, as to all intra-State shipments of which you shall have the line haul, you, the said Florida East Coast Railway Company, shall make, exact or assess no charge whatever for placing for loading, any empty car at any warehouse or other point on your own line or side tracks, or for switching the loaded car to or from the same either for delivery or for transportation, or for switching carload shipments to and from industries located on any of your own side tracks on your said line, whether designated by you as private side tracks or otherwise, either for the movement of empty car after unloaded or for handling inbound cars to be loaded; and in this: that you shall withdraw from your said tariffs of terminal charges, so far as the same shall apply to intra-State shipments of which the said Florida East Coast Railway Company shall have the line haul, all provisions for any charge for switching car load shipments to and from industries located on your own side tracks, whether designated as private side tracks or otherwise, at points on your line, either for the movement of empty cars after unloaded or for handling inbound cars to be loaded, except those provisions in accordance with said Rule 15," or to appear on a certain day before this court and show cause why it refuses so to do.

The return was filed January 13, 1913, to which the Relators interposed a demurrer and a motion to strike certain portions of the return. Both the demurrer and motion to strike were overruled. State *ex rel.* Railroad Com'rs. v. Florida East Coast R. Co., 65 Fla. 420, 62 South. Rep. 593.

Rule 15 of the rules and regulations prescribed by the Railroad Commissioners for the "government of the trans-

portation of persons and property on the railroads in Florida" is a general rule, applicable to the transportation of freight and applies to all railroads in the State. It prescribed first, a charge of two dollars per car, without regard to weight or contents, for transporting, switching or transferring a loaded car from any point on any railroad to a connecting railroad, or to any warehouse, side track or other point within the switching limits of the place; this applies to all railroads except the one having the line haul; second, that no railroad should decline to transport, switch or transfer any such car, or to receive it from any connecting railroad for such purpose; third, that the switching limits of any place should be the limits usually operated there, but in no case less than three miles; fourth, that no railroad should reduce any of its switching limits without first obtaining the approval of the Railroad Commission; fifth, that in transferring, switching or transporting a car between such points it became necessary to pass over the tracks of any intermediate railroad the charge of two dollars should be divided between the railroads at interest, excluding the one having the line haul; sixth, that when a charge was made for transferring, switching or transporting a loaded car between such points, no additional charge should be made for the accompanying movement of the empty car in the opposite direction; seventh, that no charge whatever should be made by a railroad having the line haul for placing, for loading, an empty car at any warehouse or other point on its own line or sidetrack, or for switching the loaded car to or from the same either for delivery or transportation.

There is a provision to the effect that the rule should not interfere with any prevailing legal rate for the trans-

portation of freight between different stations, and should not apply to freight that does not pay a direct freight transportation charge in connection with a switching charge.

It was charged in the alternative writ that the respondent, the Florida East Coast Railway Company, refused to obey the rule and was disregarding it in that the respondent had by its tariff of terminal charges then in force fixed switching charges at "two dollars per car to cover switching carload shipments to and from industries located on private sidetracks at all points on this line, this charge to include the movement of empty cars after unloaded, also handling inbound to be loaded," and that the respondent was charging on "intra-state shipments $2.00 per car for switching carload shipments, of which the company has the line haul, to and from industries located on certain of its own sidetracks which said company designates as private sidetracks at divers points on its said line of railway both for handling cars inbound to be loaded upon such sidetracks and for the movement of empty cars from the said sidetracks after unloading."

In other words the rule seeks to prohibit any charge whatever by a railroad having the line haul, for placing, for loading, an empty car at any warehouse or other point on its own line or sidetrack; or for switching the loaded car to or from the same either for delivery or transportation, and the writ charged the respondent with violating this feature of the rule.

The return by the respondent, among other things, avers: "(1) That the Florida East Coast Railway has at every station on the line of its road a free delivery track

or siding to which cars will be taken and delivered and removed therefrom without any switching charges whatsoever to the consignor or consignee. (2) That at divers points on the line of this respondent's road there are and have been in addition to the free delivery track certain switch tracks or spurs used entirely for private interests and that to deliver or take cars from said switching tracks or spurs involves extra service and extra expense to this respondent." That such switch tracks or spurs were constructed for private interests with the understanding and agreement that switching charges should be paid and that they do not form part of the regular delivery spurs or switch tracks of this respondent; that "respondent says that, under the rule set forth in the alternative writ, this respondent would be compelled to switch cars on these private spurs, or tracks, without charge to the consignor or shipper, although every car put on these switches or spurs or taken therefrom involves an extra service and an extra expense to this respondent; that on the free delivery tracks, cars intended for these tracks, or to be taken therefrom, are left on these tracks or taken therefrom with but little or no delay or additional expense to this respondent; that cars delivered to or taken from the spurs, or switching tracks, hereinbefore set forth, involve considerable delay and expense to this respondent; that this respondent has been compelled to keep and maintain special locomotives at St. Augustine, West Palm Beach and Miami to switch cars to and from those spurs, or switch tracks; that at other points this respondent's freight trains have to be delayed for hours at a time in taking out cars and delivering them to private interests on these switching tracks, or spurs, involving this respondent in considerable additional expense in the consumption of fuel and the hire of

employes; that during the fiscal year ending June 30, 1910, the expense directly chargeable to switching service, where special locomotives were employed at St. Augustine, West Palm Beach and Miami, was approximately $1,000 per month; that at other points where this switching was done by the regular freight trains the average cost, by reason of the delay and additional expense and additional service, was about $2.50 per car; that the approximate aggregate expense during the fiscal year ending June 30, 1910, for switching was $20,562.50; and the total revenue derived from these switching charges only $16,451.55, thereby imposing a loss on this respondent of over $4,000 that year.

And this respondent says that the foregoing does not include the switching done at Jacksonville, South Jacksonville and the transfer between Jacksonville and South Jacksonville, on which a small profit has been made, but not sufficient to meet the expenses; that for the fiscal year ending June 30, 1912, the following were the switching charges and the amount received:

|  | No. Cars Switched. | Earnings. | Expenses. |
|---|---|---|---|
| On line of road..... | 5,125 | $10,251.50 | $12,812.50 |
| Jacksonville, South Jacksonville and transfer between Jacksonville and So. Jacksonville.. | 17,283 | 34,366.00 | 31,736.00 |
| St. Augustine ..... | 1,270 | 2,539.00 | 3,507.00 |
| Miami ........... | 1,976 | 5,952.00 | 6,570.00 |
|  | 25,654 | $53,108.50 | $54,625.50 |

498        SUPREME COURT OF FLORIDA.

State, *ex rel.* Railroad Com. v. F. E. C. Ry. Co.—Opinion of Court.

showing a loss to this respondent for the fiscal year of
over $1,500.00. That the expenses given above cover only
the additional.expense due to switching into these private
sidetracks or spurs and does not cover the additional
expense in the maintenance and betterments of these
sidetracks and spurs;" that "the construction of these
spurs, or switching tracks, was for the purpose of saving
to the private interests using them, the expense of haul-
ing their freight to and from the free delivery tracks;
and that, by reason of the construction of these switches
or spurs, these private interests save from 40c to $1.00
per ton in drayage and are enabled to carry on and con-
duct their business at an infinitely lower rate than they
otherwise could conduct it." The return also avers that
if the rule is enforced against the respondent that it will
entail a yearly expense of fifty thousand dollars upon
the respondent and that its entire earnings will be so
reduced as to deprive it of ability to pay interest upon its
bonds at the rate previously agreed by it to be paid,
namely: 4%; that it would deprive the respondent of any
compensation whatever for the extra service rendered in
switching cars for private interests, and would entail
upon the respondent a loss. The return also avers that
notwithstanding the respondent has not been able to earn
enough to pay the interest upon its bonds which it had
agreed to pay, it had paid no dividend on its stock and
the small surplus shown by its financial statements is
insufficient to meet extraordinary contingencies, that it
has no sinking fund of any kind;. that the property of
the respondent represents an investment of about
$39,000,000.00 and that the present value of its property
is greater than that amount, and that these facts were
known to the Railroad Commissioners before the rule
as amended was prescribed by them. The relators joined

issue upon the return after the demurrer and motion to strike, heretofore referred to, had been overruled and denied.

There is involved in this controversy the question of the right of the respondent having the line haul to make an extra charge for placing an empty car at any warehouse or other point on its line or sidetrack for loading or for switching the loaded cars to or from the same either for delivery or transportation.

The rule is a general rule applying alike to all railroads in Florida on intra-state shipments and in this case to every place, station, spur or sidetrack of the respondent's road where the respondent makes a charge in addition to the regular freight rate for placing an empty car at any warehouse or other point on its line for loading or for switching the loaded car to or from the place either for delivery or transportation.

The railroad company has a right to load or unload its cars where its facilities or appliances for such work are, and it would be unreasonable to require it to establish other facilities to accommodate each patron. See Covington Stock-Yards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. Rep. 461; Louisville & N. R. Co. v. Central Stock Yards Co., 212 U. S. 132, text 144, 29 Sup. Ct. Rep. 246. So in Missouri Pac. R. Co. v. State of Nebraska, 217 U. S. 196, 30 Sup. Ct. Rep. 461, it was held that the carrier could not be required to build more private connections, because the obligation was not involved in the carrier's public duty and the requirement went beyond the reasonableness of the State's protective power. There is however nothing to prevent a railroad from building or permitting to be built private connections such as industrial

sidings or spur tracks and rendering to the persons thus specially accommodated the additional service of delivering their freight at warehouses located on such sidetracks or at such points thereon as may be required by the consignee, nor from furnishing empty cars to be loaded, at such warehouses or points on the private tracks. In the cases where such industrial or private sidetracks have been constructed and the published freight rates of the carrier for the transportation of freight from its terminals at that point do not include the extra expense of carrying the freight from such warehouses or points on the private siding to the carrier's terminals or place designated by it for the delivery and reception of freight; in other words where the industrial or private sidetracks are plant facilities as distinguished from the carrier's terminal facilities, and the service of carrying the freight from such warehouses or points on the industrial track or siding to the carrier's yards for shipment or the carrying of freight from the carrier's terminals to such warehouses or points on the industrial or private track for, delivery, is an additional service to the shipper or consignee when performed by the carrier, (Chicago & A. Ry. Co. v. United States, 156 Fed. Rep. 558), the carrier is entitled for such service to reasonable compensation. State _ex rel._ Railroad Com'rs. v. Atlantic Coast Line R. Co., 64 Fla. 469, text 473, 60 South. Rep. 186; Southern Railway Co. v. St. Louis Hay & G. Co., 214 U. S. 297, 29 Sup. Ct. Rep. 678.

The rule sought to be enforced here confines the service to the "switching limits of any place" which within the meaning of the rule "shall be the switching limits usually operated there, but in no case less than three miles." The alternative writ alleges that the respondent is "charging

on intra-state shipments $2.00 per car for switching car-load shipments, of which the company has had the line haul to and from industries located on certain of its own sidetracks, which said company designates as private sidetracks at divers points on its said line of railway, both for handling cars inbound to be loaded upon such tracks and for the movement of empty cars from the said sidetracks after unloading." The return of the respondent avers in substance that at every station along its line, it has provided free delivery tracks at which no switching charges are made, but at the places set out in the return and at other stations at which switching charges are made, such switching charges are made because the switches or spurs were constructed for the purpose of accommodating private interests and that they did not, and do not form part of the regular delivery spurs or switching tracks of the respondent. That at such places the spurs or switching tracks are used solely by private interests with the expressed or implied understanding and agreement that switching charges should be paid. If these spurs, switching tracks or industrial sidings, as they are called, do not in fact constitute and form part of the respondent's terminal facilities at such stations or points were loaded; and the reception of freight, at or the delivery of freight to, the warehouses or points located on such sidings and the haul to and from such warehouses or points on such sidings or spuds to the regular terminals of the respondent at such stations, established and maintained for the reception and delivery of freight, from no part of the haul or transportation of freight for which the respondent is compensated by its freight rates, then such service is an extra or additional, and not a substituted service. "But whether or not there is at any point on the respondent's line of road, an additional or extra service in connection with industrial sidings or spur

tracks upon which to base on extra charge, or whether there is at all its stations merely a substituted service which is substantially a like service to that included in the line haul rate and not received is a question of fact to be determined according to the actual conditions of operation." Los Angeles Switching Case, 234 U. S. 294, text 311, — Sup. Ct. Rep. —.

The rule is valid upon its face and binding alike upon all the carriers in the State who come within its scope, and each carrier who resists the enforcement of it must show that as to such carrier the rule is arbitrary and unreasonable in that it denies to the carrier a reasonable compensation for the specific special service required. See Missouri Rate Cases 230 U. S. 474, text 508, 33 Sup. Ct. Rep. 975; State *ex rel.,* Railroad Com'rs. v. Atlantic Coast Line R. Co., 64 Fla. 469, 60 South. Rep. 186.

In the Los Angeles Switching Case the Interstate Commerce Commission had upon proceedings instituted before it by the Associated Jobbers of Los Angeles, California, made an order in regard to switching charges within the yard limits of that city. The order required certain railroad companies to desist from exacting a charge of $2.50 per car for delivering and receiving carload freight to and from industries located upon spurs and sidetracks within their respective switching limits in Los Angeles. It also prohibited the exaction of any charge whatever other than the charge for transportation from points of origin to destination, for delivering or receiving carload freight in such cases. The Commission found that the carriers had designated certain territory as within its switching or yard limits in the city, including numerous tracks, main lines, branch lines, industry spurs, classification tracks, team tracks, hold tracks, repair tracks

and others, that freight moving in carloads was delivered at team tracks, at freight sheds or at industry spurs, that at freight sheds and team tracks no charge was imposed for receipt or delivery of carload freight over the freight rate named in the tariffs, while at the industry spurs an additional charge was made. The Commission found these spur tracks to be portions of the terminal facilities of the carriers with whose lines they connected, being distinguished from mere plant facilities. "Each spur, said the Commission, is in a real sense a railroad terminal at which the carrier receives and delivers freight." That "spur-track delivery" was a "substitute service, a service which the roads had solicited the right to give, as the evidence showed, a service which costs the industry for the installation of the track and the use of its property as a railway terminal." In the Commission's description of the character of service it was pointed out, that it involved no greater expense than would team track deliveries, that it relieves the carrier's team tracks and sheds, necessitating less outlay for expense of yards in a crowded city, promoted speedy release of equipment and vastly aided in conducting a commerce which is greater than the carrier's own facilities could freely, adequately and economically handle. "After a most exhaustive inquiry" the report says "we cannot find, taking this service as a whole in the same way that it is treated by the carriers, that the service is more expensive to the carrier than if all cars were given team-track delivery."

The court construing the finding of the Commission said: "Nor do we understand that the commission ruled that the receipt and delivery of goods at points located upon spurs or sidetracks could not, in any circumstances be regarded as a distinct service for which separate com-

pensation might be demanded." "And it is apparent that the ruling of the commission would not apply in any case where by reason of the location and extent of the spur tracks and the character of the movement the facts were essentially different from those upon which the decision was based." Citing Interstate Commerce Commission v. Stickney, 215 U. S. 98, 30 Sup. Ct. Rep. 66.

The court accepted the findings of the Commission as conclusions of fact. The rule in the Los Angeles Switching Cases applied only to the City of Los Angeles, and the findings of the Commission related of course only to the conditions as they existed there. The court said that the real question before the Commission was whether "there was really an extra service in the circumstances shown."

In determining the question of whether the spur track or industrial switching complained of in these proceedings, is extra service by the respondent to the persons favored by such service, several matters should be considered, all of which enter into the service and fix its character. The location and extent of the spur, the cost of construction and maintenance, the character of the movement, whether it is part of the haul or a separate and distinct movement of the freight for the accommodation of the patron of the road and if a separate movement, whether it is substituted for the original delivery. The question of the difference in cost to the railroad between a free track delivery and a delivery upon an industrial siding is not a controlling factor to determine the character of the movement, but is evidentiary only. In or near large centers of commerce, where land available for yards is both difficult to obtain and expensive, where commerce is large and taxes the road's facilities to handle it,

and where the railroad's method of handling freight in car loads is to carry a train of cars first to a place called the "breaking up yards" and then by use of a switch engine shunt each car to the place where it was destined to be received by the consignee and unloaded, it is not difficult to understand that sidetracks or industrial sidings, built by railroads on private property to serve private interests with the latter's consent, which also facilitates the speedy release of the railroad's equipment and relieves the pressure upon it for free track space, are considered as constituting part of the terminal facilities of a railroad at such a place. Under such conditions, there is one continuous movement of the car from the point of the origin of the shipment to the place on the sidetrack where it is to be received by the consignee and unloaded. The carrier saves the expense of providing lands for the extra yards that might be necessary; the demand upon its team tracks and sheds is relieved, and its facilities for the handling of its freight business are greatly increased. In such case even if the cost of fuel and labor per car for switching to an industrial track should be greater, less or equal to the cost of fuel and labor per car for switching to the team tracks, the fact would have little bearing either way in determining whether the sidetracks at such a place were terminal facilities of the railroad company or merely plant facilities of the industry to which the service was rendered; that is to say whether the service upon those tracks was substituted or accessorial.

It does not necessarily follow that because a carrier delivers freight in car loads to consignees on private sidetracks that such service was made in substitution of a delivery which might otherwise have been made on the free or station sidetracks. The service of delivering freight to

consignees in carloads on private or industrial sidings is a service which may not in the present state of the law be required of the railroads, but on the other hand it is not a service which is forbidden. It would therefore seem to lie more within the field of contract than in the domain of the duties to the public of a public service corporation. If the service is of some benefit to the patron of the road and involves some service by and expense to the railway company, and is no part of the transportation but in addition thereto, the company is entitled to charge for the service and in such charge is not confined to the actual cost of it. Southern Railway Co. v. St. Louis Hay & G. Co., 214 U. S. 297, 29 Sup. Ct. Rep. 678. On the other hand if the railroad company by agreement with private industries near the company's terminals may secure the use of private property for spur tracks, thereby facilitating the handling of freight, increasing its terminal facilities and relieving the pressure of demand for extended yards and greater conveniences and relieving the team or free tracks and sheds, there is no law to prevent the carrier entering into an agreement to make such deliveries without additional compensation; in other words substituting such delivery in place of the delivery on the team or free tracks.

There are two theories on which the Railroad Commissioners may deal with the subject: one is on the theory that the service is a substituted and not accessorial service and may prohibit any charge therefor, because the carrier has already been compensated by the freight rate which it has received for the transportation of the goods; the other theory is that the service is one which the railroad company has undertaken in addition to the line haul and may regulate the charge by allowing only a just

and reasonable compensation for the service.   It is on the first theory that Rule 15 is based.

The evidence submitted, we think, clearly and convincingly establishes the contention of the respondent that some if not all of the spur or industrial sidetracks of the respondent on which the charge of two dollars is made for switching, are not part of the yard facilities proper at the different places where the service complained of is rendered, but are additional conveniences erected for private interests and the placing of cars thereon either empty or loaded for the convenience of the particular person or interest served, involves an extra service on the part of the respondent and an additional cost.   In many cases the industrial or spur tracks were constructed entirely at the cost of the respondent and in every case maintained by it; in many cases the tracks were put in at the request of the industries to be served and for their especial convenience, and under an agreement to pay the respondent a stipulated price for the delivery of the cars to the private track; in most of the places it appears that the regular yard or free tracks of the respondent afford sufficient conveniences for the delivery of all freight, the delivery to private or industrial sidings involve more time, labor and expense to the company.   The service appears from our reading of the evidence to be clearly and convincingly accessorial.   To require the respondent to render this service free, to treat it as a substituted service for that of delivery on the free tracks of the respondent would under the conditions shown by the return amount to a discrimination by the respondent in favor of the person or corporation for whom the delivery is made and against one engaged in a like business at the same locality, but not specially favored by the respondent.

We have shown that this matter of delivering freight in car loads to consignees upon private tracks for the convenience and financial advantage of private persons or corporations is a service that may not be required of the carrier, but that it is a service in which it may engage; but in engaging in such work the carrier should avoid unjust discriminations.

It is unnecessary to discuss that phase of the question bearing upon the effect upon respondent's entire earnings of the enforcement of the rule. It having been made to appear by the respondent to the satisfaction of the court that the service complained of is clearly an additional or accessorial service to that of delivery of freight to or upon the free tracks of the road, the peremptory writ is denied.

TAYLOR, C. J., AND SHACKLEFORD, COCKRELL AND WHITFIELD, JJ., concur.