## UNION PAC. R. CO. v. PUBLIC SERVICE COMMISSION et al.

No. 7219.   Decided November 22, 1949.   (211 P. 2d 851.)

Rehearing denied February 6, 1950.

See 13 C. J. S., Carriers, sec. 365. Loading facilities by railroad for convenience of public shippers, see note, 30 A. L. R. 73. See, also, 9 Am. Jur. 640.

*Bryan P. Leverich*, Salt Lake City, *A. U. Miner*, Salt Lake City, *M. J. Bronson*, Salt Lake City, *Howard F. Coray*, Salt Lake City, for plaintiff.

*Clinton D. Vernon*, Atty. Gen., *Mark K. Boyle*, Asst. Atty. Gen., *McKay, Burton, Nielsen & Richards*, Salt Lake City, for defendants.

WADE, Justice.

This is a proceeding in certiorari brought by the Union Pacific Railroad Company to review an order of the Public Service Commission that it build further stock loading facilities at Wahsatch, Utah.

The Union Pacific Railroad Company, to which we shall hereafter refer as the railroad, is a common carrier of freight and passengers engaged in interstate commerce and maintains double main track lines between eastern and western points. In the vicinity of Wahsatch these lines run approximately east and west with the southerly of these tracks handling east bound trains and the northerly track west-bound trains. The stock loading facilities are located on the south side of these double tracks and have been there for about forty years. At the time these facilities were built the railroad had only one track there and highway 30, which

was then a dirt road, followed a course along the north side of the railroad's right-of-way and crossed its tracks about three-quarters of a mile west of its present station house and stock pens. At that time the shippers of stock bringing their stock from the north to the shipping point would cross the tracks and the highway over flat, even terrain of about a mile or more, and thus reach the shipping point easily. In the early 1930's the State Highway Commission changed the location of highway 30 from the north to the south side of the railroad right-of-way. The traffic on this highway and on the railroad itself has greatly increased since the present loading facilities were built. Shippers from the north were not greatly discommoded because of these changes until 1942 when a tunnel through which the east-bound track of the railroad ran was replaced with an open cut with banks dropping steeply to the railroad bed where it went through the old location of the tunnel. This forced the shippers from the north to use some other crossing point to the yards. The railroad built fences along its north right-of-way with a gate at its present crossing to its station. This crossing is a 16 foot dirt road and requires the shipper to bunch his livestock tightly against the fence and gates at the north line of the crossing, and, when allowed, to hurriedly try to drive his stock southward along this road across the railroad's double tracks a distance of about 150 feet, then west between the station house and other build-ings along a narrow road for about a few hundred feet, and then between the railroad right-of-way and highway 30 for about a quarter of a mile west to the loading station.

Shipping of livestock at Wahsatch occurs mostly in the spring and fall when the livestock is moved from winter to summer and from summer to winter ranges and the facilities the railroad has for stock loading are usually adequate to hold all the stock in the absence of an emer-gency, such as an early snow storm when all shippers try to get loaded at the same time. However, most of the stock, both cattle and sheep, which is shipped here, being range

stock, is wild and easily frightened by signs of civilization such as houses, cars, hanging laundry, and especially trains and the noises emanating from a busy railroad station. Because of the nature of this stock it is difficult to confine them to a small area for any length of time and yet because of the heavy traffic on the railroad it is necessary to do this so that train schedules will not be interrupted while the stock is making a crossing. The necessity to herd the stock close to the fence and gate to await an opportunity to cross has resulted, on occasion, in stampedes when the cattle became frightened by the whistle of a train or the action of a flagman with resultant loss of weight to cattle and danger to the men in charge of the stock, as well as to traffic on the highway. The sheep were also affected and tended to run away and get onto the highway. It is to avoid this crossing and the dangers and damage to the stock involved therein that the shippers from the north want the railroad to build stock loading facilities on the north side. At the time of the hearing before the commission there were only two shippers from the north, the Deseret Livestock Company and the Francis interests, the former being by far the largest shipper of any in the community, comprising over 50% of all the railroad's business at that point. This company owns land extending for miles along the railroad right-of-way north of Wahsatch and it would be necessary for it to give an easement on some of this land sufficient for the construction of the loading facilities it desires, as well as a 600 foot right-of-way running east from the railroad's property so that the general public would not have to trespass on its lands in order to be able to use the loading platform. This the Deseret Livestock Company has consented to do. To build the type of facilities requested by the shippers from the north it would cost the railroad over $20,000. The Deseret Livestock Company's business give it over $70,000 per year and the Wahsatch station itself is one of the largest shipping centers of stock on the railroad's entire system.

It is the railroad's contention that the commission acted arbitrarily and unlawfully in finding that the present loading facilities are inadequate and unreasonable.

It is the railroad's contention that the order is arbitrary and unreasonable because the only objection to the present facilities for loading and unloading is to its location. It concedes that it has a duty to furnish reasonably adequate loading and unloading facilities with a reasonable means of ingress and egress to them, but that since its business is that of transportation, its duties to furnish facilities extend only so far as transportation is concerned. In support of this view they cite *Atchison, Topeka and Santa Fe Railway Company et al.* v. *United States et al.,* 295 U. S. 193, 55 S. Ct. 748, 79 L. Ed. 1382; *Great Northern Railway Company* v. *State of Minnesota ex rel. State Railroad & Warehouse Commission,* 238 U. S. 340, 35 S. Ct. 753, 59 L. Ed. 1337; *Covington Stock-yards Co.* v. *Keith,* 139 U. S. 128, 11 S. Ct. 461, 35 L. Ed. 73; and *State ex rel. Railroad Com'rs* v. *Florida East Coast R. Co.,* 69 Fla. 491, 68 So. 761, L. R. A. 1918A, 158. We have carefully read these cases but cannot see where they help the railroad under the facts involved here. None of these cases hold that it is not part of the transportation business to furnish facilities to which shippers may have safe ingress and egress, and that is the question that is really involved in this case. The commission found that as to shippers from the north the ingress and egress to and from the present stock loading facilities at Wahsatch are dangerous and unsafe for the public, the shippers and the livestock.

Section 76-4-7 U. C. A. 1943, provides that:

"Whenever the commission shall find, after a hearing, that the rules, regulations, practices, equipment, appliances, facilities, or service of any public utility * * * are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and shall fix the same by its order, rule or regulation. * * *"

The evidence before the commission amply sustained its finding that the means of ingress and egress supplied by the railroad at Wahsatch to its shippers from the north was unreasonable and unsafe. During the daylight hours when it is necessary to ship livestock, it was shown that the traffic on its rails was very heavy and often there was no more than five minutes between trains and that it takes at least half hour to hustle a livestock shipment across the tracks. The short intervals between trains necessitated the huddling of the stock close to the fence and gate and then, upon a signal from a railroad man, to hurry this stock across the tracks. Sometimes there would be insufficient time to get the whole herd or flock across and then it would be necessary to try and cut the herd which, being wild range animals, were difficult to handle anyway, and under the circumstances attending the crossing would often become frightened and stampede or run away with resultant danger to the men handling them, the traffic on the highway and the stock, to say nothing about the damages sustained by the shipper because of loss of weight incurred by the frightened animals. Under such circumstances it was reasonable for the commission to find that the necessity of crossing two mainline railroad tracks after being bunched on a narrow road was not a reasonable or safe means of ingress to its facilities.

The railroad further argues that even if this court should find that the commission was not arbitrary in determining that the present facilities are inadequate, nevertheless the order requiring the building of new loading facilities on the north side was error because the commission could only order the railroad to provide the minimum reasonable facilities to be furnished and there was no evidence nor finding that the facilities ordered to be built are the minimum necessary to render the service adequate.

The whole purpose of the hearing before the commission was to determine whether there were adequate facilities for the shippers of livestock from the north of Wahsatch

and if not, what would make them adequate. Evidence was introduced as to the amount and kind of shipments and the sizes of the pens and structures needed to take care of them. No evidence was offered to prove that the deficiency in the facilities could be remedied by some method other than the building of the loading facilities on the north side for a less sum than is now required of the railroad to expend. The railroad did not in these proceedings or in its petition for rehearing, point out any method to the commission other than the building of the loading facilities which would remedy the situation and which would be less costly. Under the facts and circumstances of this case the commission was reasonable in finding that the building of loading facilities to conform with certain specifications introduced in evidence before it was a reasonable expenditure to be made by the railroad for the convenience of the public and the shippers and in ordering the railroad to build these facilities.

The railroad further contends that the order of the commission to build further facilities is invalid because they will be private facilities and not public in nature and for that reason it requires the railroad to violate the Interstate Commerce Act, 49 U. S. C. A. § 1 et seq., which forbids undue preferences to individuals. It argues that the facilities will be private in nature because shippers from the south, who, it concedes, will not want to use these facilities anyway, will not be able to approach them without using the crossing now used by the shippers from the north, and that crossing is a private and not a public crossing as evidenced by a gate which is kept locked on occasion, which runs across the roadway approaching this crossing. We fail to see the force of this argument. If the crossing which must be used to approach the railroad facilities is private and because of this the facilities are private, then the railroad his failed to provide any facilities whatever for the shippers from the north or a proper means of ingress and egress because they have to use this same crossing. We

doubt that is what the railroad intended to prove by its argument. They argue further that the facilities will be private in nature because there are actually only two shippers from the north, one of whom ships but an inconsiderable amount and the other, the Deseret Livestock Company, who will be, for all practical purposes, the chief beneficiary of these facilities since it owns miles of land north of Wahsatch and is a shipper of considerable magnitude.

The facilities involved herein are loading and unloading pens. The commission has ordered, and the Deseret Livestock Company has agreed, to grant an easement to the railroad to permit its building such facilities on its land and also to provide for the public generally an ■ easement over a strip of land 600 feet in width from the railroad crossing to the stockyards north of the north line of the railroad right-of-way, and from the west line of the crossing to these facilities. It is apparent from this order that the commission has ordered the erection of public facilities—that is, facilities to which the public generally will have a right of use. As stated in *Garkane Power Co., Inc.* v. *Public Service Commission of Utah,* 98 Utah 466, 100 P. 2d 571, 573, 132 A. L. R. 1490, cited by the railroad:

" 'The test * * * is * * * whether the public has a legal right to the use which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner.' "

See also *Stockdale* v. *Rio Grande W. R. Co.,* 28 Utah 201, on pages 208, 209, 77 P. 849, 851, wherein we said:

"* * * True, it is evident from its location and surroundings that only a limited number of persons and business institutions will have occasion to use it, but that does not make of it a private undertaking. The test is, will any and all persons and business institutions who may have occasion to do so be permitted to use it? * * *"

From what we have said it follows that because at present there may be only two shippers from the north who wish to avail themselves of the use of the facilities ■ it does not follow that the facilities are private in

nature as long as the indefinite public generally has the right to its use.

The order of the commission is affirmed, with costs.

PRATT, C. J., and WOLFE and McDONOUGH, JJ., concur.

LATIMER, Justice.

I concur in the results.

This is one of those cases in which the evidence is barely sufficient to sustain the action of the Commission.

The two issues of importance are (1) the public character of the facilities; and (2) the reasonableness of the construction.

The evidence indicates that the present means of ingress and egress for shippers from the north is dangerous and unsatisfactory. Some improvement was needed to correct this situation and the Commission determined that the solution lay in requiring the railroad company to construct the loading pens on the north of the railroad right-of-way. As part of its order the Commission required the Deseret Livestock Company to grant an easement over certain of its property. This easement apparently permits shippers from the south to drive their stock across the two tracks but if they seek to drive their livestock over this route they will be faced with the same hazards and difficulties as are the shippers from the north who are now using the south loading pens. The facilities, therefore, would be of no use to shippers from the south as the present loading pens answer their purposes and the dangers involved in crossing the tracks would preclude any practical use of the pens on the north by landowners in the south. This would be of little importance if the record disclosed that all shippers from the north had reasonable access to the newly constructed facilities. However, the land to the north of the railroad right-of-way is either owned or controlled by the Deseret Live-

stock Company and the record contains only one statement which might indicate that other shippers on the north had a legal way to approach the pens from the north. One of the shippers testified that he trailed his sheep across the land of the Deseret Livestock Company and was entitled so to do because of long usage. This testimony plus some vague references to an old highway suggests the possibility that other shippers from lands on the north might have a usable route to the facilities without crossing the railroad right-of-way.

The other issue is largely answered by the activities of the railroad company when request was made to have new loading pens constructed. After the Deseret Livestock Company had complained of the dangers incident to using the old approach and after it demanded new facilities, it suggested a possible location contiguous to a wye located in the general area of Wahsatch, Utah. Agents of the railroad company visited the area, concluded the terrain would not permit building the pens near the wye, and suggested a more appropriate location for the pens. The type of pen to be constructed and its location were largely determined by agents of the railroad company. No issue was made that a cheaper or better method could be devised in spite of the fact that the controversy had existed for a number of years and the railroad company was afforded plenty of opportunity to determine a more economical solution of the problem. From the record and the issues as framed, the Commission could reasonably find that the shippers from the north were only interested in eliminating the dangers and hazards involved in loading from the south and that the railroad company had agreed that if a new means must be provided, the loading pens designed by it and the proposed spur track located by it were the most economical way of removing the difficulties.

For these reasons, I concur.