**DAVIS, Director General and Federal Agent, v. SIMMONS.   (No. 1887.)**

(Court of Civil Appeals of Texas. Amarillo. March 15, 1922. Rehearing Denied May 3, 1922.)

1. **Evidence ⬳547 — Questions asked expert witnesses as to damages to cattle by delay in unloading held proper.**

Questions asked expert witnesses, who had testified to the market value of plaintiff's cattle at the time and place they should have been unloaded, as to the amount per head by which the cattle were damaged by the carrier's delay in unloading them, and by holding them in crowded pens, in effect called for testimony by such witnesses as to the value of the cattle after they were injured, and was not erroneous.

2. **Carriers ⬳228(5)—Evidence held to show connection between negligence of carrier and death of cattle.**

A witness who testified to unloading plaintiff's cattle and accompanying them to a pasture, and as to the appearance of cattle and their weakened condition, sufficiently showed the causal connection between the negligence of the carrier and the death of some of the cattle while they were under witness' charge during the first ten days after the shipment.

3. **Appeal and error ⬳1052(5)—Evidence as to death of cattle for which no allowance was made by jury is not prejudicial to defendant.**

Defendant was not prejudiced by evidence as to the death of cattle after the shipment, where the jury allowed no damages for the loss of any of the cattle.

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Appeal and error ⬾⟶930(2)—Trial ⬾⟶296 (4, 5)—Failure to qualify charge as to negligence by reference to contributory negligence held not error in view of other charges; presumed that jury construed instructions together.**

The failure to qualify the court's charge submitting the carrier's negligence to the jury by reference to the effect of the shipper's contributory negligence was not erroneous, where other paragraphs of the charge and charges specially requested by the carrier and given by the court fully presented the issue of contributory negligence, since the jury will be presumed to have read all of the charges and to have construed the charge on negligence in connection with the others.

**5. Trial ⬾⟶296(3)—Charge as to injury to one cow held not error, where element of proximate cause was covered by other instructions.**

In an action for injuries to a shipment of cattle, a charge as to the injury to one cow, which fell while being unloaded on account of negligence in spotting the car, was not erroneous as omitting the element of proximate cause, where that element was covered by other paragraphs of the charge and by a special requested charge relating to the injury of the particular cow in question.

**6. Trial ⬾⟶248—Charge as to duty of shipper to remove stock at destination as affected by agreement with conductor held not abstract.**

In an action for injuries to a shipment of cattle because of delay in unloading them, where the defendant pleaded contributory negligence of the shipper in failing promptly to remove the cattle first unloaded so as to permit the others to be unloaded into the pen, a charge submitting to the jury the issue whether the shipper's delay in removing the cattle was excused by an arrangement with the conductor, whereby he was to have a reasonable time to procure horses to hold the cattle already unloaded while the others were being unloaded, was not objectionable as abstract and misleading, but was concrete.

**7. Carriers ⬾⟶47(2) — Agents presumed to have authority to make contracts relating to business intrusted to them.**

The public has a right to assume agents of a carrier are authorized to make contracts from the manner in which the agents are employed or are seemingly intrusted by their principal, since the carriers are generally corporations which can act only through agents.

**8. Carriers ⬾⟶210 — Owe duty to unload live stock within reasonable time.**

A carrier undertaking to carry live stock assumes the duty to unload it at destination within a reasonable time, and such duty does not end until the consignee has a reasonable time after arrival to remove them.

**9. Carriers ⬾⟶210—Owe duty to furnish necessary facilities for unloading live stock.**

A carrier undertaking to transport live stock owes the duty to furnish reasonable facilities necessary for unloading the stock at destination even if the duty to unload is assumed by the shipper, as may be done by special con-tract, and an engine to move and spot the cars is a necessary facility.

**10. Trial ⬾⟶194(15)—Charge as to agreement with conductor to delay unloading until horses could be procured held not on the weight of the evidence.**

In an action for injuries to cattle shipment, an instruction that if conductor agreed the shipper should have a reasonable time to procure horses to hold the stock already unloaded, and the shipper relied on such agreement and procured the horses within that time, the defendant, in the exercise of ordinary care, was required to wait a reasonable time for the purpose of permitting shipper to procure horses for that purpose, was not on the weight of the evidence because telling the jury what would amount to negligence in the particular case.

**11. Appeal and error ⬾⟶1070(1)—Permitting jury to state separately damages to different lots of cattle held not prejudicial error.**

In an action for damages to a shipment of cattle, where the evidence showed that part of the cattle were crowded into receiving pens and the rest kept on the cars for 12 hours after arrival at destination, and the evidence showed the damage to the cattle on the cars was greater than that to those in the receiving pens, it was not error prejudicial to defendant for the court to permit the jury to state separately its findings as to the damage to the two lots of cattle.

**12. Trial ⬾⟶260(1)—Requested charge covered in so far as correct by other charges need not be given.**

It was not error for the trial court to refuse a special requested charge which, in so far as it was correct, was covered by the main charge and by other special charges.

### On Motion for Rehearing.

**13. Carriers ⬾⟶230(7)—Charge held intended to excuse shipper's negligent delay in receiving stock.**

In an action for injuries to cattle before being unloaded on arrival at destination, where the carrier pleaded contributory negligence of the shipper in failing to remove the stock already unloaded from the receiving pens, a charge submitting to the jury the effect of an agreement by the carrier's conductor to give the shipper a reasonable time to procure horses to hold the stock already unloaded, so as to empty the pen, was evidently not drawn to submit the issue of contributory negligence, but to submit the shipper's excuse relieving him from the charge of negligence.

**14. Carriers ⬾⟶230(7)—Charge as to agreement with conductor held only to require carrier to give shipper reasonable time to remove cattle.**

A charge that if the conductor, after part of the cattle were unloaded and the receiving pen was full, agreed that the shipper should have a reasonable time to procure horses to hold the cattle already unloaded so that the rest could be unloaded, the carrier was negligent if the shipper procured the horses within a reasonable time, but the carrier did not hold its engine a reasonable time for that pur-

---

⬾⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

pose, was not based on the conductor's authority to make a binding agreement to wait for a time regardless of whether it was reasonable or not, but was based on the carrier's duty to give the shipper an opportunity to remove the cattle and was not erroneous.

**15. Carriers ⊜210—Conductor has authority to agree to give reasonable time for removing stock.**

The conductor in charge of a train carrying stock has authority to bind the carrier by an agreement to give the shipper a reasonable time within which to procure horses to hold the stock already unloaded so as to empty the receiving pens for the other stock, and the carrier was liable for failing to hold its engine, which was necessary to the unloading of the stock, during the reasonable time so granted.

**16. Courts ⊜247(5)—Case involving new facts but only established principles of law not certified to the Supreme Court.**

An action against a carrier to recover damages to a shipment of cattle while detained in the receiving pens and on the cars after arrival at destination, in which the carrier pleaded contributory negligence of the shipper in failing to remove the cattle first unloaded from the pens, so as to permit the unloading of the balance, involves only well-established principles of law, though the facts are novel, and the case will therefore not be certified to the Supreme Court.

Appeal from District Court, Potter County; Henry S. Bishop, Judge.

Action by R. E. Simmons against James Cox Davis, as Director General and Federal Agent. Judgment for the plaintiff, and defendant appeals. Affirmed.

Turner & Dooley, of Amarillo, and Thompson, Barwise, Wharton & Hiner, of Fort Worth, for appellant.

Hendricks & Mood and P. F. Sapp, all of Amarillo, for appellee.

HUFF, C. J. Simmons sued for damage to a shipment of cattle over the Chicago, Rock Island & Gulf Railway Company and the Fort Worth & Denver City Railway Company, which roads were under the control of the government through its Director General of Railroads. It is alleged in effect that the cattle were shipped from Ramsdell, Wheeler county, Tex., to Channing, Tex., in a train of 28 cars, which arrived at Channing at 3:30 o'clock a. m., April 18, 1918, during a strong, biting, cold wind with snow flying; that the appellee, in the exercise of ordinary care, was ready to receive the cattle, but that appellant negligently unloaded 410 head of grown cattle and crowded them into insufficient pens, and negligently detached the engine from the remaining 16 cars of cattle and left them standing on the track for more than 12 hours after a reasonable time in which they should have been unloaded, and

negligently gave appellee misinformation as to when an engine would arrive or could be obtained to assist in completing the unloading, thereby inducing the appellee and his men to remain at the depot with the cattle confined in the pen and cars until some time about 6 o'clock p. m., setting out the damages received by the cattle, 830 head of grown cattle, which were she cattle; more than 50 head of calves and one car of horses. The answer of appellant is to the effect that, if the unloading pens were inadequate as to capacity for holding the number of cattle in the train, the appellee knew of that fact and negligently failed to prepare to receive them at destination; that when the pens were filled the appellee negligently failed and refused to remove the cattle therefrom, and after waiting a reasonable time therefor the unloading was necessarily suspended until appellee removed the cattle, and if there was any loss it was through his own misconduct. The case was tried to a jury and submitted upon a general charge. In response thereto the jury assessed damages in the sum of $3,450, upon which judgment was entered, and from which this appeal is prosecuted.

The first, second, and third assignments are based upon the testimony of E. S. Collins and Hugh Exum, as set out in the bills of exception, as follows, with reference to Collins:

"Q. What effect, so far as the market—I mean so far as the value of the cattle is concerned—would it have upon them to keep some 400 or a little more, around that number, on the cars for some 12 or 14 hours, of this class of cattle, that you observed at that time? A. Well, I would think it would damage these cattle $6 or $7 a head to leave them on the cars.

"Q. Well, let me ask you this question: As to the cattle that were confined in the cars for some 12 or 14 hours, cattle of this class, and from your knowledge of the class of cattle and the cattle business, confining the injury to the cattle, now, and the damage to the cattle, Mr. Collins, solely on that account, what would you consider the difference in the market value of these cattle on account of that confinement in the cars for that length of time in that community and for about that length of time that year upon the market value per head? A. Well, as I stated before, I think the cattle would be damaged in the market value of $7 per head.

"Q. What would you say relative to these cattle that were confined in these pens in a crowded condition, if the pens were loaded about to the limit, the effect upon the cattle, and the market value under those conditions, basing it solely upon the confinement in the pens for that length of time? A. It would not hurt them much in the pens, although when you get 400 or 500 head of cattle in them they are pretty badly crowded, I would say about $4 or something like that."

As to Exum, the question and answer are as follows:

"Q. Now then, in your opinion, what was the difference in the market value of these cattle if there was a 12 or 14 hours' detention, about half of ·them in the pens and about half of them on the cars, at that time? A. Taking into consideration the character of the cattle, heavy cows, cows with little calves, springer cows, and the condition of the weather, and the time they got them out, one thing and another, I think it damaged those cattle from $5 to $7.50 per head."

The objection urged at the time was that the evidence sought called for an opinion, and that the same would not be proper legal testimony upon any proper or applicable measure of damages in the case.

The witness Collins had testified that he was an experienced cattleman, handling cattle, pasturing and shipping them, for about 30 years. He gave his opinion as to the effect on cattle standing in the cars and pens for 12 or 14 hours without movement, etc. He saw the cattle at the pens and described them. They were mother cows and springers. Standing in the cars injures cattle of this class more than dry cows or steers, and he gave the effect on cattle that such treatment would have upon the class in question. He saw the cattle at the pens and again that day after they were moved. Noticed them on the drive; it took two days to drive them eight miles. He saw the cattle every day while they were in his vacant pasture and saw the cattle through the summer and noted their recuperation and how they thrived; that on account of their condition their value was affected. He stated that the market value at the time they arrived at destination was about $85 per head. The statement of facts in this case sets out his testimony as follows:

"If about 400 head of cattle of this class were crowded in pens for about 12 or 14 hours, and about 400 head were crowded in cars for about 14 hours, as to the effect on their market value, cattle in that condition that these cattle were in in the spring, you understand, it would hurt them worse than it would fat cattle, naturally would, and I would consider that confinement of the cattle in the cars for that length of time would hurt them worse than that length of confinement in the pens. I think it would damage the cattle $6 or $7 a head to leave them on the cars. As to the cattle that were confined in the cars for 12 hours or 14 hours, cattle of this class, and from my knowledge of the class of cattle and the cattle business, confining the injury to the cattle and the damage to the cattle solely on that account, I think the cattle would be damaged in the market value of $6 or $7 per head. With respect to these cattle that were confined in the pens in a crowded condition, assuming the pens were loaded about to the limit, I would say regarding the effect upon the cattle and the market value of those conditions, basing it solely upon the confinement in the pens for that length of time, that it would not hurt them much in the pens, although those pens, when you get 400 or 500 head of cattle in them, are pretty badly crowded, I would say about $4 per head, or something like that."

Hugh Exum also qualified as an experienced cattleman and in shipping cattle. He saw the cattle at the pens and assisted in unloading them and described the effect the holding would have on that class of cattle:

"I have an idea about what Mr. Simmons' cattle were worth on the market there at Channing or in the community at the time they arrived there. There was a ready market for that class of cows at that time, in 1918. The market value of those cattle at that time for the weight of the cattle there at the time, as they were, was about $90 a head, I would say. Considering the detention of those cattle, part of them in the pens and part on the cars, after their arrival at Channing, I, in my opinion, would say that there was a difference in the market value of them by reason of such detention from 12 to 14 hours. I saw the bunch of cattle in question; was acquainted with them and know. I knew at that time the market for and relative to that kind and class of cattle. Likewise for that bunch of cows, just taking them as they come, springers, and also cows with calves; would say that the market value at that time and place for such cattle as were these about $90 per head. In my opinion 12 or 14 hours' detention in the pens and in the cars would affect these cattle and injure them."

Then follows the question and answer above set out to Exum.

[1] It will be observed that the questions propounded to the witnesses were to state the difference in the market value of the cattle caused by the delay in unloading and holding them in the cars and in the pens. This was not, as we understand, merely a statement in general terms of damages per head, but was a statement as to the market value as affected by the injury. We can see no practical difference in stating the market value upon arrival of the cattle at destination as if it was $85 per head and after detention in the cars and pens, that cattle in the pens were of the market value of $80 and those in the cars at $77.50, and stating it as we think the testimony warrants, that those in the pens in market value were worth $5 less after the detention and those in the cars $7.50 less. This, we think, is the substantial effect of the testimony, to which objection is urged. We believe this case falls clearly within the holding of the Supreme Court in the case of Railway Co. v. Prunty, 230 S. W. 396. We especially refer to the above case and the opinions, both by the majority and minority of the Court of Civil Appeals, as reported in 233 S. W. 625. Judge Conner, rendering the minority opinion, sets out the question to and the answer of the witness as follows:

"What was the difference, if any, between the reasonable market value of the mares at the time and in the condition in which they did ar-

rive and the condition in which they should have arrived, handled with ordinary care and diligence?" The answer was: "I think it was anywhere from $20 to $25 difference."

We think the questions and answers in this case fall within the rule established by the above case. The assignments will therefore be overruled.

[2, 3] The fourth assignment is based on the admission of the testimony of W. R. Swink to the effect that he stayed on the Simmons ranch 40 days, and during the first 10 or 12 days there was a loss of about 18 head of cattle. The objection urged was that no connection was established between the death of any of these cows and any alleged negligence on the part of the appellant. The evidence of this witness shows he assisted in unloading the cattle, accompanied them to the pasture, and was with them during the losses. He testified as to the delay in unloading, the bad appearance of the cattle, and their then weakened condition. Other testimony shows the cattle were badly skinned, bruised, some of the horns knocked down, and the like, when unloaded, and that such confinement in the car and pens would produce that condition. We believe the causal connection was sufficiently shown to admit this testimony. Besides, we are unable to perceive any injury in admitting the testimony, as the jury did not allow damages for the loss of any of the cows on the ranch. The only effect of the testimony would have been by relation to the injuries sustained at the time of holding them on the cars, etc. This assignment will be overruled.

The fifth, sixth, seventh, eighth, and ninth assignment are to the effect that the court erred in refusing to instruct a verdict for appellant and in overruling several objections to the charge of the court and also the verdict of the jury is not supported by the evidence, all of which objections and assignments are based upon the assertion that there was no evidence as to the market value before and after the injury, and therefore the charge of the court was unwarranted and the verdict unsustained by the evidence. These assignments will be overruled for the reasons given in overruling the first, second, and third assignments.

[4] The tenth assignment is predicated upon an objection to paragraph 2 of the trial court's charge to the jury. The objection made is to the effect that, because the court's charge was not qualified with reference to the effect of the appellee's contributory negligence, it was therefore erroneous. In the paragraph of which complaint is urged the court submitted to the jury acts alleged to have been negligence on the part of the appellant causing the injury. The trial court in other paragraphs defined "contributory negligence," and in subdivision 2 of paragraph 3 charged the jury that if the appellant was negligent in receiving the cattle or in not removing them from the pens so as to unload the remainder thereto to find for appellant; also in paragraph 4 the jury were told even though they should find that appellant was negligent, the proximate cause of the injury to the cattle, but if they further found appellee was guilty of contributory negligence they could not find for appellee anything. The trial court also gave appellant's specially requested charges on contributory negligence, Nos. 5, 16, 17, and 18; some upon the specific point presented by appellant's brief, and No. 18 specifically charged:

"This would be true notwithstanding the fact that negligence, if any, on the part of the defendant, also had a proximate part in causing injury and damages, if any."

Surely the appellant obtained all he could in good conscience require at the hands of the trial court. The jury will be presumed to have read the charges of the court as well as the special charges requested and given. These several charges will be construed in connection with the charges of which complaint is made, and, so construed, manifestly no probable injury resulted to appellant from the charge complained of. Railway Co. v. Matula, 79 Tex. 577, 15 S. W. 574.

[5] The eleventh assignment is predicated upon an objection to the court's charge, authorizing a recovery for one cow, which fell while unloading on account of negligence in spotting the car and in arranging the "bull board," between the car and chute, because it is asserted the charge omitted the essential element of proximate cause. The trial court did charge the jury on this item, in paragraph 4, to the effect that such negligence must have been the proximate cause of the negligence of the appellant, and he gave appellant's specially requested charge No. 9. This charge gave the appellant's theory as to this particular animal. Nothing more reasonable could be required in order to fully protect appellant.

The twelfth assignment is predicated upon the following charge, to which several objections were made:

"It was the duty of the plaintiff to accept his cattle at their destination when delivered to him in the stock pens by the railroad company, but if you find from the evidence that, after a part of said cattle had been unloaded from the cars into said pens, he had some arrangement or understanding with the conductor, Batson, that he would be given time to provide men and horses for the purpose of removing from the pens the cattle which had been delivered into same, and if you further find that plaintiff, in the exercise of ordinary care, relied upon such agreement or understanding, if any there was, and that in the exercise of ordinary care procured horses and men for the purpose of removing from the pens the cattle that had been delivered therein and to hold same until the remaining cattle be un-

loaded, then the defendant, in the exercise of ordinary care, was required to await a reasonable time for the purpose of allowing plaintiffs to procure said horses and men for this purpose."

The propositions presented under this assignment are: (1) The charge is abstract and misleading; (2) that there is no evidence that the conductor had authority, either express or implied, to make the agreement therein mentioned; (3) it is on the weight of the evidence because it assumed to tell the jury what would constitute negligence on the part of appellant.

This charge was evidently framed on appellant's plea of contributory negligence on the part of appellee to receive the cattle and that he negligently failed and refused to remove the cattle from the pens within a reasonable time suspending the unloading, and that the loss was through his misconduct. The evidence in this case shows the pens for receiving the cattle as they were unloaded were too small for the entire 28 cars and that about half could be unloaded into them. It was apparently conceded, or at least treated by all parties, that both carrier and shipper knew of this condition before the shipment was undertaken. The appellee shipped with the train a car of horses for the purpose of holding the cattle after the delivery, or rather to meet the condition which resulted from the inadequacy of the pens. Upon arriving at the pens and after spotting the car, the horses were first unloaded and taken to the barn of the appellee, three or four blocks from the pens, to feed and water, as they had been on the train without food or water. The conductor of the train, the evidence suggests, knew of the purpose of bringing the horses and unloading to feed them. The train arrived about 3:30 a. m. in the midst of an April blizzard, which one of the witnesses described as being such as occurs in this country at that period of the year, and that sleet and snow were falling. The pens were filled about 5:30 a. m., and at that time the appellee testified, and he appears to be corroborated by other witnesses, that he sought the conductor and told him he would have to give him time to go to the lot and get the saddle horses and empty the pens so they could finish the unloading, and that the conductor said to him, while he was getting the horses, that he (the conductor) would run down and finish with his lunch. Appellee went after the horses, which the testimony indicates were four blocks away, some say a quarter of a mile, and returned in from 20 to 30 minutes with the horses, after the conversation, and when he returned there was no engine, but it had gone. The appellee then went to the depot, at which an operator was then present, who informed appellee that the conductor had him wire the dispatcher and that the dispatcher ordered him in. After the engine left, it seems the agent told appellee there would be another engine in two or three hours, but none came, which they could use, until about 6 o'clock in the afternoon of that day, after which the remainder of the cattle were unloaded. The conductor, however, testified that appellee told him that he would not empty the pens until daylight, and that he (the conductor) told appellee he could not wait there that long, and that he would go down and ask for instruction of the dispatcher, which he did. It will be seen the testimony presented a square issue between the appellee and his witnesses and the conductor as to the cause for leaving the cars on the track unloaded and the pens full of cattle. The conductor's testimony tends to support the charge of negligence on the part of appellee in failing and refusing to receive his cattle at destination, or in failing to prepare to relieve the situation by emptying the pens of the cattle unloaded into them.

[6] We do not know that we understand just what appellant intends to assert as error in the proposition that the charge is entirely abstract and misleading. The charge appears to us, instead of being abstract, to be concrete. It was given on the issue of contributory negligence charged against appellee. The court directs the jury to find whether or not certain facts were true and, if so, to find whether the appellee, in the exercise of ordinary care, relied thereon. If they so found, then he would be justified in relying upon the facts found by the jury. In other words, he would not be guilty of contributory negligence.

Again, it is asserted the evidence did not authorize the finding that the conductor had authority express or implied, to make the agreement. The contract of transportation required a delivery to the consignee at the place of destination. It is statutory, as well as the general rule as to common carriers, that suitable pens and facilities must be provided to unload live stock preparatory to and as part of the delivery by the carrier to the consignee. But the rule does not require more than that the pens should be sufficient in capacity to accommodate the ordinary and usual volume of business, or such business as is to be reasonably anticipated at the point in question. Section 1551a, vol. 4, Elliott on Railroads. In this case it seems to have been the issue that in making the delivery by the carrier ordinary care was not exercised; not that it had failed in its duty to furnish adequate facilities for unloading and pens of a capacity sufficient to receive the shipment. The appellant sought to meet this charge of negligence by establishing that appellee failed and refused to accept the delivery at the time and place of the delivery, or that owing to his own neg-

·ligence in receiving the shipment he contributed to the injury. The evidence would appear to indicate, or, at least, the case seems to have been tried upon the presumption, that both the carrier and shipper contracted for the transportation with the knowledge that the pens were not of sufficient capacity to accommodate. the entire shipment at one time, but that in order to receive them or make a delivery the appellee would be required to make some extra arrangements for receiving them. This appears to have been done, but the question remains: Was it such as an ordinarily prudent man would have provided under the circumstances? As a part of the circumstances, the conductor's consent to wait until the appellee could go a short distance for men and horses; to hold the first pen full of cattle until the balance of the train could be unloaded. It is this agreement or permission to allow time for the holding that appellant asserts the conductor could not make without express or implied authority shown by the evidence. This depends, we think, largely upon the duty of the carrier with·reference thereto.

[7, 8] Of course the carrier is not bound by unauthorized acts or agreements. We think the general rule as to the agent of a carrier applicable in this case. The public have a right to suppose agents are authorized to make contracts or agreements from the manner in which they are employed, or are seemingly intrusted by their principal. As most of the carrying business now is done by corporations which can act only through the instrumentalities of agents, it is necessary for the protection of the shipper that this should be so. Sections 460–462, vol. 2, Hutch. Carriers; McCarty v. Railway Co., 79 Tex. 33, 15 S. W. 164. A carrier, when it undertakes to carry live stock, assumes certain obligations to deliver at destination. They are to be delivered at destination to the parties designated to receive them if he is present or can with reasonable effort be found.

"No obligation of the carrier, whether the freight consists of goods or of live stock, is more strictly enforced. * * * If the consignee is absent from the place of destination, or cannot * * * be found, and no one appears to represent him, the carrier may place the goods in a warehouse or store with a responsible person. * * * If the freight consist, as in this case, of live stock, the carrier will not, under the circumstances mentioned, * * * relieve himself from responsibility by turning the animals loose. He must place them in some suitable quarters where they can be properly fed and sheltered, under the charge of a competent person." Railway Co. v. Commercial National Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287.

[9] It is the duty of the carrier to unload within a reasonable time, and we are inclined to the view that the carrier's liability does not end until the consignee has a reasonable time after arrival to remove them. At least, the duty is on the carrier to afford the shipper opportunity to remove the shipment and should provide reasonable facilities for doing so. Sections 1520, 1521, vol. 4, Elliott on Railroads. The carrier is bound to afford the shipper reasonable opportunity to unload even when he assumes that duty. Primarily such duty rests upon the railroad, but may' be imposed upon the shipper by special contract. Section 1552, vol. 4, Elliott on Railroads; Railroad Co. v. Trawick, 80 Tex. 270, 15 S. W. 568, 18 S. W. 948. The carrier in this case having accepted the shipment to be delivered at that point, the duty rested upon it to at least afford the shipper reasonable facilities for accepting and receiving the cattle or to unload them. An engine to move and spot the cars was ·a necessary facility. The carrier was present, through the conductor, into whose care he had placed the shipment, and clothed him with apparent authority to fulfill the duty resting upon the carrier. · The conductor's judgment, skill, and care was that of the carrier. He was therefore to be held to have all necessary or needful authority over the shipment; to do all that was reasonably necessary to perform his master's duty, under the contract of shipment. It seems to us, under the circumstances of this case, if the conductor consented to wait until the appellee could go a short distance for his horses and men to enable the cattle in the pens to be removed therefrom, and to facilitate the delivery of the remainder, and the time was reasonable, the shipper would have the right to rely upon that authority or agreement, and, if he performed his part within a reasonable time and in a reasonable manner, he should be acquitted of contributory negligence. We believe the charge of the trial court to be a proper one under the facts of this case.

[10] Neither do we think the charge is upon the weight of the evidence in the particular pointed out by appellant in its brief. The phrase upon which appellant relies is segregated from the body of the charge of which it is a part. The phrase as segregated reads:

"In the exercise of ordinary care was required to await a reasonable time for the purpose of allowing plaintiff to procure said horses and men."

Even in this phrase appellant omits the words "for these purposes," which qualify the time to procure the horses and men and limit it to a purpose which under the law appellee clearly had the right to act upon, even if the duty had been placed upon him by· agreement to unload the cattle. The appellant also omits the beginning of the

phrase, "then the defendant." Clearly, these words coupled the phrase following to that which had preceded, and that which preceded was to the effect that if the jury found the facts stated an excuse for not instantly emptying the pen, if the appellee acted with ordinary care and with reasonable diligence upon the consent of the conductor, who at that time in the nature of things was representing his master, he would have the right to rely thereon. The assignment will be overruled.

[11] The thirteenth and fourteenth assignments will be overruled. We do not think the charges here complained of are on the weight of the evidence. We see no error which could have resulted to the appellant's injury by the court directing the jury to itemize the verdict; that is requiring them to find damages to the cattle in the cars and the damages to the cattle unloaded into the pens. The evidence clearly separated or gave a different amount of damages to the two bunches of cattle. It is not perceived by us how a jury of ordinary intelligence would thereby be induced to base their verdict upon an incorrect measure of damages. As we view the matter, there was no reversible error in the charges objected to.

[12] Under the fifteenth assignment, the appellant complains at the refusal of the court to give a specially requested charge. In so far as this charge was correct it was covered, we think, in the court's main charge and by several special charges requested by the appellant and given by the trial court. We find no reversible error, and the judgment of the trial court will be affirmed.

## On Motion for Rehearing.

[13, 14] The evident purpose of the charge of which complaint is made in the twelfth assignment is that it was not drawn to submit the contributory negligence pleaded, but it was submitted upon appellee's excuse for not then sooner emptying the pen so that the remaining cattle could be unloaded into it and presenting the circumstances upon which the appellee relied as acquitting him of negligence. The jury was not instructed that the conductor had the right to make an agreement to wait, but the charge simply submitted to the jury if appellee had made some arrangements or had an understanding with the conductor for time to secure horses to hold the cattle and that he relied upon such arrangements and exercised ordinary care in securing them for that purpose, then the defendant, in the exercise of ordinary care, was required to wait a reasonable time for that purpose. In other words, the conductor was not required to wait simply because of the arrangements he had made, but in the exercise of ordinary care he was required to wait a reasonable time. This, we believe to be the meaning of the charge. The jury were also required, in connection therewith, to find that the shipper used ordinary care to procure the horses, etc. In such a case the shipper would not be guilty of contributory negligence. Such facts, if so found, negatived the charge of contributory negligence on the part of the shipper as pleaded by appellant. Liability was not sought to be fastened on appellant by this charge. The shipper, in order to be exonerated and before he could be exonerated by the jury, they were required to find not only the arrangement, but that it was made by the appellant in the exercise of ordinary care and then it could only be for a reasonable time.

[15] It seems to be the purpose in sending out a conductor in charge of a train of cattle to authorize him to exercise ordinary care therewith and he may be authorized to make arrangements with the shipper to await a reasonable time to effect a delivery which was in aid of the performance of the duty owing by his master to the shipper. Being the duty of the master to deliver the authority of the conductor in charge of the train should be implied, we think, and that it is within the apparent scope of his authority in the exercise of ordinary care to arrange to wait a reasonable time on the shipper. The authorities relied upon by appellant are cases where employees, servants, or agents sought to bind their master beyond the apparent scope of their authority, or when they had no such authority. The assignments and propositions in appellant's brief do not raise the question which on motion and argument thereon is sought to be presented. The question originally presented was that there was no authority shown authorizing the conductor to make contracts for appellant. We regarded the charge as presenting one phase of the carrier's duty with reference to delivery of the shipment; and that, as the carrier had chosen the conductor as his representative in that service, the shipper would have the right to rely upon an arrangement made with the conductor acting in the exercise of ordinary care to give a reasonable time to empty the pens. The shipper was not justified by the arrangements unless the conductor was exercising ordinary care, or to assent to a delay for an unreasonable time. It seems to us the appellant has given a strained construction to the charge, especially when considered in the light of the entire charge of the court the criticism of this particular one is not justified.

The court first instructed the jury that it was the duty of appellant to deliver the cattle with reasonable dispatch and within a reasonable time, and, if it was guilty of negligence in not unloading the cattle into the pens within a reasonable time and with reasonable dispatch, etc., the shipper could recover. Second, it was the duty of the shipper to accept his cattle at their destination with reasonable dispatch, etc. This being

the charge complained of: Third, if he had not such arrangements made, etc., if the injury resulted from the negligence of appellee in not receiving the cattle, or any act or omission on his part in not receiving the cattle from the pens contributed to such injury, and because of such acts or omissions appellant could not deliver the remainder in the pens then to find for appellant. Fourth, if the appellant, after arrival, exercised ordinary care and delivered the remainder into the pens within a reasonable time, to find for appellant. Fifth, at the request of appellant the court gave his requested charges to the effect if a man of ordinary prudence would have made arrangements and provided to remove the cattle from the pens as unloaded, so as not to interrupt the unloading by filling the pens, and if such failure by appellee to make such provision was responsible, either in whole or in part, for the injury, then it was the jury's duty to return a verdict in favor of defendant. Sixth (at appellant's request) the jury was told it was the duty of appellee to remove from the pens the cattle first placed therein after being unloaded within a reasonable time, to be determined by all the facts and circumstances and appellee's relation thereto. And if he failed to remove the first cattle from the pens within a reasonable time then he would not be entitled to recover. It is now and was our view on the original hearing, that the trial court sought only to submit the carrier's duty to deliver, using ordinary care to do so within a reasonable time. It was the duty of the shipper to receive the cattle and use ordinary care to do so, and, if he did not, he would not be permitted to recover if his failure caused the injury. If in making the arrangements to empty the pens, of which the company under the circumstances knew the necessity, the conductor in permitting the shipper to obtain horses to hold the cattle to empty the pens, if he acted in the exercise of ordinary care in doing so, he could give reasonable time for that purpose. When the charge is read as a whole, the one of which complaint is made is not subject, in our judgment, to the criticism that the jury should find for the appellee if the conductor consented to wait for the horses, whether he did so in the exercise of ordinary care and gave an unreasonable time therefor; but the trial court, we think, left it to the jury whether the conductor, in so consenting, was exercising ordinary care and whether the time was a reasonable one. Interpreted in the light of the facts and circumstances, and in the light of all the other charges, we do not think the question of ordinary care and reasonable time was withdrawn from the jury.

In response to a request for additional findings, we make the following:

The pens at Channing were inadequate to unload the entire shipment of the train therein. Appellant knew that fact when it accepted the shipment and undertook to deliver the cattle at that point. The appellee also knew that fact when he shipped his cattle. He shipped a carload of horses with the train to be used for the purpose of holding the first pen full until the remaining cattle on the train could be unloaded into the pen. The conductor and appellant knew of facts which charged appellant with notice of this purpose. The horses were first unloaded and fed four blocks from the pen, and appellee could not empty the pens without the horses, and that he obtained the horses and men in a reasonable time for that purpose after the pen was filled and arrangement was made with the conductor to obtain the horses, and that such arrangement was made within the exercise of ordinary care on the part of the conductor in charge of the train, by which he gave a reasonable time to the shipper to obtain the horses, and that the horses were obtained within a reasonable time, and appellee was not guilty of contributory negligence in receiving the cattle in the manner in which he did under the circumstances of this case. That the cattle were being unloaded by spotting the cars at the unloading chute by means of the engine attached to that train, and that there was then no other at that time and place. The conductor, in leaving with the engine, left the appellee without any adequate means to unload the remainder of the cars of cattle until another engine could be obtained twelve hours later. That the engine thus used was a necessary means to effect the delivery of the cattle as appellant had agreed to do. There was a station agent at Channing and his office was at the depot, which was three or four blocks from the unloading pen; but he was not at the depot until after the engine and conductor had left. There was, however, a boy in charge of the telegraph office at the depot as an operator at the time the conductor says he went to the depot to telegraph for instructions. The train dispatcher gave the telegram sent to his office by the conductor, which, as he states, is as follows:

"I have unloaded only part of my train of stock. The pens are full and owner refuses to empty pens to allow remainder of shipment to be unloaded. He claims he will have to get cow punchers from the ranch to handle the stock already unloaded before he will unload balance of stock. Advise."

The dispatcher replied:

"Leave the stock spotted and will have extra 313-north unload it. You may proceed."

The conductor, however, testified that he wired that the owner would not unload until daylight and that was the reason he wired for instructions. The shipper, appellee, testified he only asked for time to go four blocks for his horses. The dispatcher says

he would have held the conductor at Channing to complete the unloading of the shipment if the shipper had been in position to empty the pens so the remainder of the shipment could be unloaded. The facts in this case are sufficient to justify the finding that the shipper was in position to empty the pens after a few minutes' delay and that the conductor misstated the facts in his wire to the dispatcher; that, if the dispatcher had known the truth of the matter, the engine and train would have been held; and that it was not because of any schedule time that he directed the conductor to proceed. The conductor testified he had four hours' time limit after he got to Texline before the limit would have prevented his working, longer and that he could have spent that much time at Channing in unloading cattle. He further testified that he left Channing at 6:25 a. m., and that it was then about daylight; that the trains were then running on mountain time, and that 6 o'clock mountain time at the time of this shipment was 7 o'clock sun or central time; that he finished loading into the pens the cattle that were unloaded about "5:45 a. m. and left Channing 6:25 a. m., which was in 40 minutes." He said after unloading they took coal and water. This witness also testified they first unloaded the horses, which were shipped in the train, and he saw them around there after they were unloaded. He did not know it if they were taken to the lots for the purpose of being fed. Channing is an intermediate point between Childress and Texline, the division point between which the crew in question made this particular trip; but the conductor shows he had four more hours to unload the remaining cars if he had reported the facts as they were to the dispatcher. We believe the above covers the findings requested, not as the appellant asked that they be found, but as supported by the evidence and the verdict of the jury.

[16] The appellant also requests that we certify this case to the Supreme Court, because, as it is asserted, that an important legal question is involved, not controlled by any exact legal precedent in this state, etc. We suppose, if the Supreme Court finds the question of such importance to the jurisprudence of this state, that that court will grant a writ of error. In so far as we view the questions involved, there is nothing novel in the principles governing this case. The facts may not be in the usual run and may be out of the ordinary, but the principles, as we conceive it, are the same as in the ordinary run of cases. The charge, as we construe it, is not as appellant interprets it, and we see no ground for supposing that the jury were probably misled or that any injustice has been done by the charge of which complaint is made. We believe the case has been fairly tried and should not be reversed, and

there is no occasion, as we conceive the matter, to certify any question in this case to the Supreme Court.

The above motion will be overruled.