[5] The record discloses the absence of any legal predicate for the admission of the conversations with the deceased after he reached his home upon the theory that they were dying declarations. There seems to have been no proof of a consciousness of impending death, or otherwise a predicate laid which, under the law of dying declarations, is essential. See Branch's Ann. P. C. pp. 1034, 1035, § 1863, citing cases, among them Lister v. State, 1 Tex. App. 740; Craven v. State, 49 Tex. Cr. R. 80, 90 S. W. 311, 122 Am. St. Rep. 799; Hunnicutt v. State, 18 Tex. App. 516, 51 Am. Rep. 330; Douglas v. State, 58 Tex. Cr. R. 122, 124 S. W. 933, 137 Am. St. Rep. 930; Highsmith v. State, 41 Tex. Cr. R. 37, 50 S. W. 723, 51 S. W. 919; Francis v. State, 170 S. W. 782; Ledbetter v. State, 23 Tex. App. 256, 5 S. W. 226; Phillips v. State, 50 Tex. Cr. R. 129, 94 S. W. 1051.

[6-9] The testimony of M. L. Massey as to the details of his business transactions with J. H. Wallace should, we think, not be admitted upon another trial. Neither should the fact that appellant's bill at Massey's store was unsatisfied at the time of the trial. Nor the fact that deceased's lodge dues were paid by a member of his family after he was injured. Nor the fact that the father of deceased met appellant on the street some time after the difficulty, and appellant drew out a knife, and "looked daggers" at the witness, and appeared angry.

[10] The witness McGinnis, having been discredited by proof of indictment for perjury, should have been allowed to explain that he was not guilty of the charge. Johnson v. State, 69 Tex. Cr. R. 107, 153 S. W. 875; Cowart v. State, 71 Tex. Cr. R. 116, 158 S. W. 809; Tippett v. State, 37 Tex. Cr. R. 191, 39 S. W. 120.

Because the evidence is insufficient to show that appellant was culpable under the law of principals, and because of the admission in evidence of the hearsay statements of deceased, the judgment of the lower court is reversed, and the cause remanded.

---

MASSEY v. TEXAS & P. RY. CO. (No. 767.)

(Court of Civil Appeals of Texas. El Paso. Jan. 17, 1918.)

1. CARRIERS ⬥210 — SHIPMENT OF LIVE STOCK — DUTIES AND LIABILITIES AS TO LOADING.

It was the duty of a carrier of cattle to load them on the cars, but if the shipper's agent undertook to and did load them, and as a result of his negligence in overloading the car or rough handling the cattle were injured, the carrier was not liable for the resulting damage.

2. CARRIERS ⬥210—SHIPMENT OF LIVE STOCK —DUTIES AND LIABILITIES AS TO LOADING.

If a shipper's agent merely assisted the train crew in loading cattle under the control of the train conductor, and the car was negligently overloaded and the cattle thereby injured, then the carrier was liable for the resulting damage, but not for any injury sustained by rough handling of the cattle by the shipper's agent while loading when not authorized by the conductor.

3. CARRIERS ⬥228(1) — INJURIES TO LIVE STOCK—BURDEN OF PROOF.

In an action for damages to a shipment of calves defended on the ground that the shipper, through his agent, undertook to and did load the calves, and that over its protest the car was overloaded, and that the damage sustained was caused by negligence in overloading and rough handling by the agent, the burden was on the carrier to show that the agent undertook to load the cattle and roughly handled them in so doing.

4. DEPOSITIONS ⬥64(3) — EXAMINATION OF WITNESSES—RESPONSIVENESS OF ANSWERS.

In an action against a carrier for damage to a shipment of cattle, a brakeman was asked, in taking his deposition, whether he was present and heard the conductor request the party in charge of the calves to unload some of them as the car was overloaded, and if so to state fully what they said. In part of his answer he stated that the car was jammed full and too full. He was also asked to state whether he was present and heard the conductor inform those in charge of the loading that they could not load any more calves into the car, and if they did not insist upon loading nine head more, and to state fully what occurred during the loading of the calves. Part of his answer was that this was the worst crowded car of cattle he had ever seen in 14 years of railroading. Held, that the portions of the answers referred to were not responsive to the questions, and should have been stricken on motion.

5. DEPOSITIONS ⬥64(3) — EXAMINATION OF WITNESSES—RESPONSIVENESS OF ANSWERS.

In such action much of an answer of the conductor to a question asked him as to whether he had anything to do with the shipment and if so what, and to state fully everything he did in regard thereto, held not responsive.

Appeal from Midland County Court; J. M. De Armond, Judge.

Action by W. C. Massey against the Texas & Pacific Railway Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

H. A. Leaverton and J. M. Caldwell, both of Midland, for appellant. E. R. Bryan, of Midland, for appellee.

### Statement of Case.

HIGGINS, J. Massey shipped a carload of calves over appellee's line of railroad from Metz to Midland. He brought this suit to recover damages to the shipment alleged to have been caused by "the carelessness and negligence of defendant making" the shipment. The railway company defended upon the ground that plaintiff, through his agent, undertook to load and did load the calves at Metz; that over its protest the car containing same was overloaded; and that the damage sustained by the calves was caused by negligence in overloading and rough handling thereof by said agent in loading.

There is evidence to show that the calves were delivered to defendant at Metz in good condition, and that they were in an injured and damaged condition upon arrival at Midland. The evidence on the part of defendant tended to show that plaintiff's agent at Metz undertook to load and did load the cattle; that he overloaded the car containing same over the protest of its conductor, and handled them very roughly in loading; that their injuries were due to this overloading and rough handling. On the other hand, the testimony of plaintiff's agent Allen was that in his opinion the car was not overloaded. He said that the cattle were loaded by himself, a boy that came with him, and the brakeman of the train; that the conductor was there part of the time while they were loading; that when they got 78 head in the car the conductor told them to quit and close the door and they did so. They left nine in the pen. He denied that the conductor told him to take some of the calves out of the car; denied that he refused to remove some of them as the conductor testified he did. He said that he began loading before the arrival of the train; that upon arrival of the train it scared the calves and practically all that had been placed in the car ran out. He also denied that any of the calves were injured while being loaded. As we construe his testimony the conclusion may be fairly deduced that in the loading of the cattle he and the boy with him voluntarily assisted and co-operated with the train crew in loading the cattle under the control of the train conductor.

### Opinion.

[1, 2] It was the duty of the railway company to load the cattle upon the cars at Metz, but if plaintiff, by his agent Allen, undertook to so load the same and did load them and as a result of his negligence in overloading or rough handling the cattle were injured, then defendant is not liable for the resulting damage. Railway Co. v. Edins, 36 Tex. Civ. App. 639, 83 S. W. 253;

Railway Co. v. O'Laughlin, 72 S. W. 610; Railway Co. v. Belcher, 41 S. W. 706; Railway Co. v. Stribling, 34 S. W. 1003. On the other hand, if the agent Allen merely assisted the train crew in the loading of the cattle under the control of the train conductor, and the car was negligently overloaded and the cattle thereby injured, then the railway company is liable for the resulting damage. In any event, the railway company would not be liable for any injuries sustained by rough handling of the cattle by the agent Allen while loading. There is no evidence that the conductor authorized any such conduct by Allen. Upon retrial these phases of the cases should be submitted under appropriate instructions.

[3] The burden of showing that the agent Allen undertook to load the cattle at Metz, and that he roughly handled them in so doing, rested upon defendant. Upon this phase of the case the depositions of Conductor Schull and Brakeman Meadow was offered by defendant. This question was propounded to Schull:

"This is a suit for damage to shipment of one car of calves from Metz to Midland, Tex., on February 17 and 18, 1916, by M. J. Allen to W. C. Massey. Please state whether you, as conductor of the Texas & Pacific Railway Company, had anything to do with this shipment of calves, and, if so, what? Please state fully everything you did in regard to these calves."

The witness answered:

"I handled this carload of calves from Metz to Midland as conductor for the Texas & Pacific Railway Company. When I got to Metz they were loading these calves into the car. It was 11 o'clock p. m., on the 17th of February, A. D. 1916. We were there 20 minutes. I walked up to the pens and the two men who were loading the cattle were cursing, swearing, and yelling; one man was hanging to the top of the door punching and kicking the calves with a large pair of spurs which he had on his boots. I looked into the car and I asked the gentlemen how many calves he had to put into the car; he said 87 head. I told him to stop right now and count the number you now have left in the pens. We counted nine left in the pens. I told him that the car was overloaded and that he could not get that amount of calves into a 36-foot car, and asked him to run 19 head out of car, and he said that he had 78 head in the car and that he would be damned if he would take them out. I told him that if he refused to take them out to close the door as it was impossible to get the other nine in. He asked me how about the nine other head and I told him that it was up to the shipper and the company to transport them to Midland. We left Metz at 11:35 p. m., and arrived at Midland stock yards at 2 o'clock a. m., on the 18th. I and my brakeman assisted the man in charge to unload the calves to see how many were dead. This in order to ascertain how many calves were dead on account of the car being overloaded and the man in charge refusing to load the car as per my request at Metz. I found one calf dead and several punched full of holes, which was done by the gentleman that had had the spurs on when he was kicking and punching the calves when they were being loaded. The man in charge could not sign his name and just made an X mark on the stock report."

The witness Meadow was asked:

"Please state whether or not you were present and heard Conductor C. A. Schull request

the party in charge of the said calves to unload some of them out of the car as the car was overloaded, and, if so, please state fully what they said?"

The last sentence of the answer to this question was:

"The car was then jammed full and too full."

Another question to Meadow was:

"Please state whether you were present and heard Conductor C. A. Schull inform those in charge of loading that they could not load any more calves into the car, and if they did not insist upon loading nine head more that were left in the pens? State fully what occurred during the loading of these calves."

The last sentence of his answer to this question was:

"This was the worst crowded car of cattle that I have ever seen in my 14 years of railroading."

[4, 5] It is very apparent that the quoted portions of Meadow's answers were not responsive to the questions propounded. They directly supported the defense relied upon by the railway company, and the plaintiff's motion to strike out these portions of the answers should have been sustained. The same is true of much of the quoted answer of the Conductor Schull. All of those portions of his answer not fairly responsive to the inquiry as to what he did, or explanatory thereof, should have been stricken out upon plaintiff's motion so to do. For the error in refusing so to do the cause must be reversed.

The remaining assignments relate to alleged errors in the court's charge and to the refusal to give instructions requested by plaintiff. It is unnecessary to discuss these assignments in detail. The requested instructions do not go to the controlling issues in the case. The particular objections urged against the charge given are without merit. Upon retrial the controlling phases of the case as indicated in the first part of this opinion should be submitted in the charge by a concrete application of the law to the facts proven.

Reversed and remanded.

WALTHALL, J., did not sit being absent on committee of judges assisting the Supreme Court.