# ATCHISON, TOPEKA & SANTA FE RAILWAY CO. ET AL. *v.* UNITED STATES ET AL.*

No. 606. Argued March 15, 1935.—Decided April 29, 1935.

---

* Together with No. 607, *Union Stock Yard & Transit Co.* v. *United States et al.* Appeal from the District Court of the United States for the Southern District of New York.

*Mr. Frank H. Towner,* with whom *Messrs. Silas H. Strawn, Ralph M. Shaw, E. A. Boyd, P. F. Gault, Walter McFarland, J. N. Davis, Wallace Hughes, James Stillwell,* and *L. H. Strasser* were on the brief, for appellants in No. 606.

*Mr. Charles E. Cotterill* for appellant in No. 607.

*Mr. J. Stanley Payne,* with whom *Solicitor General Biggs, Assistant Attorney General Stephens,* and *Messrs. Elmer B. Collins* and *Daniel W. Knowlton* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. Carl M. Owen,* with whom *Mr. Harold J. Gallagher* was on the brief, for Hygrade Food Products Corp., appellee.

MR. JUSTICE BUTLER delivered the opinion of the Court.

These are separate appeals from a decree of a three judge court dismissing a suit to enjoin enforcement of an order of the Interstate Commerce Commission. 8 F. Supp. 825. The suit was brought by 24 railroads, appellants in No. 606, for convenience called "carriers," against the United States and Interstate Commerce Commission. Twenty-one are line carriers; the other three perform only switching service. The Union Stock Yard & Transit Company, appellant in No. 607, and the Hygrade Food Products Corporation, the complainant before the Commission and one of the appellees here, intervened.

By its complaint to the Commission the Hygrade Company attacked as unreasonable in violation of § 1 of the Interstate Commerce Act (Title 49, U. S. C.) the carriers' tariff charges applicable to switching livestock to

its packing plant. And it assailed as inapplicable the yardage charge collected by the Yards Company on livestock delivered at the stockyards. It claims that the service covered by the charge is included in transportation, §§ 1 (3), 15 (5); that, not being specified in carriers' tariffs, they are unlawful, § 6; and that the practice of the carriers and Yards Company in making the stockyards their depot for delivery of livestock pursuant to an arrangement by which the Yards Company imposes a yardage charge is an unjust and unreasonable practice in violation of § 1.

Subject to regulation by the Secretary of Agriculture under the Packers and Stockyards Act, 1921, 42 Stat. 159, 7 U. S. C., c. 9, the Yards Company operates public stockyards in Chicago. The Hygrade Company in 1929 acquired and has since operated a packing plant that many years ago was established on the Chicago Junction Railway a short distance from the unloading pens in the stockyards. Tracks of the Junction Railway extend into, and are used to haul dead freight to and from, the Hygrade plant. The charge for switching livestock into the plant is $12 per car. To avoid that burden, the Hygrade Company elects, as did its predecessors, to have all livestock intended for slaughter at the plant shipped to the stockyards. These yards are livestock terminals of the carriers and are served by trains operated by them over the tracks of the Junction Railway. Each carrier's tariff specifies rates covering transportation of livestock to Chicago including delivery to consignee on the carrier's own line. But, as practically all shipments to Chicago are consigned to the public stockyards, there is little, if any, need or use of individual carrier unloading facilities.

To cover the movement over the Junction Railway to the public stockyards, western carriers add to the Chicago rate $2.70 and eastern carriers $1.35 per car. No additional charge is made for unloading. The carriers employ and pay the Yards Company for unloading the livestock

the amount—$1 per car—specified in its tariffs filed with the Interstate Commerce Commission. That work is accomplished by means of platforms and chutes down which the animals are driven from the cars into pens. These pens are not suitable places in which long to hold livestock. At peak periods of stock train arrivals these facilities are so much in use that the Yards Company is able to permit the animals to remain in the unloading pens only a short time—often not more than a few minutes. And, unless promptly taken away by consignee, the Yards Company transfers them to holding pens.

About 85 per cent. of all consignments to the Hygrade Company are so transferred. The others are by it taken from the unloading pens and driven through ways or alleys within the extensive yards properties over scales, where for the purpose of computing freight charges they are weighed, to and along an elevated runway over pens in the yards and the tracks of the Junction Railway, thence to and through a tunnel, under the proposed extension of Pershing Road (located along what was formerly a part of the Chicago River) ending at the Hygrade Company's plant which abuts on that highway. The Yards Company, in accordance with its tariffs filed with the Secretary of Agriculture, makes and collects a specified charge per head on all livestock received in the yards—being 35, 25, 12 and 8 cents respectively for cattle, calves, hogs and sheep. These charges apply to animals taken by the consignee immediately from unloading pens to its plant as well as to those transferred by the Yards Company to the holding pens, later to be taken by consignee. The tariffs of the Yards Company also specify charges for other services.[1] As to each carload, it makes a statement showing separately the carrier's charges and its own. It

---

[1] They include: Feed and feeding, bedding, dipping and spraying, immunizing and incidental care of swine, cattle testing, cleaning and disinfecting of pens, etc., branding, and other special services.

collects the total, accounts to the carriers for those covered by their tariffs filed with the Interstate Commerce Commission, and retains the balance.

The report of the Commission (195 I. C. C. 553) states: The stockyards are livestock terminals of the carriers. Consignees are entitled to delivery at suitable pens without charge for the mere placement therein of the livestock. The unloading pens are suitable for the accomplishment of proper delivery to consignee. The method of handling is efficient and satisfactory. The fact that the carriers have at Chicago destinations other places of delivery where no charge is made is not a legally sufficient reason for an extra charge at the stockyards. As to about 15 per cent. of all shipments consigned to complainant " it has taken delivery before the animals were placed in holding pens." There is no occasion for putting them in holding pens if prompt delivery is desired. The fact that other freight is subject to storage or demurrage charges only after the lapse of considerable time is not a sufficient reason why similar rules should apply in respect of yardage charges on livestock. After unloading, livestock requires unusual attention and care such as is not required by other freight.

The Commission concluded: The switching charge is not shown to be unreasonable or otherwise unlawful.

Prompt delivery does not require pens to be so equipped as to provide rest, feed and water for livestock. If placement into pens that are so equipped is desired, an extra charge therefor is not within the inhibition of § 15.

There are no services performed after unloading for which defendants may assess charges in instances where delivery is taken at the unloading pens. The livestock in carloads consigned to complainant at the yards is not subject to yardage charges in instances where delivery is so taken. Complainant is entitled to reparation.

The Commission ordered that the carriers and Yards Company cease and desist from practices which subject

complainant to payment of yardage charges on livestock, in instances where delivery is taken at the unloading pens, and that the proceeding may be reopened to ascertain the amount of reparation.

Appellants contend that transportation ends with unloading of livestock into suitable pens and that, for lack of essential findings of fact, the order is void.

Transportation of ordinary livestock in carload lots from and to points other than public stockyards has always been deemed to include furnishing of facilities at the place of shipment for loading and at destination for unloading and suitable ways for convenient ingress and egress. *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 134–135. *Erie R. Co.* v. *Shuart,* 250 U. S. 465, 468. 2 Hutchinson, Carriers, 3d ed., § 510. Cf. *Norfolk & Western Ry.* v. *Public Service Comm'n,* 265 U. S. 70, 74. And, in the absence of understanding or agreement to the contrary, transportation includes loading and unloading. 4 Elliott, Railroads, 3d ed., § 2346. *Indiana Union Traction Co.* v. *Benadum,* 42 Ind. App. 121, 123; 83 N. E. 261. *Davis* v. *Simmons* (Tex. Civ. App.), 240 S. W. 970, 976. *Massey* v. *Texas & P. Ry. Co.* (Tex. Civ. App.) 200 S. W. 409, 410. *Benson* v. *Gray,* 154 Mass. 391, 394; 28 N. E. 275.

But for many years, in virtue of custom and as well by the terms of shipping contracts in general use, that burden has been laid upon shippers. 2 Hutchinson, Carriers, 3d ed., § 711. *London & L. Fire Ins. Co.* v. *Rome, W. & O. R. Co.,* 144 N. Y. 200, 205; 39 N. E. 79. Indeed, October 21, 1921, the Interstate Commerce Commission, acting under authority of § 15 (1) and following a form of clause submitted by shippers and carriers, prescribed a uniform livestock contract containing § 4 (a): " The shipper at his own risk and expense shall load and unload the live stock into and out of cars, except in those instances where this duty is made obligatory upon the carrier by statute or

is assumed by a lawful tariff provision." 64 I. C. C. 357, 363, App. F. But the practice has long been otherwise at the Chicago Union Stockyards. For more than 50 years prior to 1917 the carriers without any additional charge to shipper or consignee unloaded livestock into pens provided by the Yards Company. *Adams* v. *Mills*, 286 U. S. 397, 410. Paragraph (5) of § 15 enacted in 1920 made the practice general and compulsory in public stockyards throughout the United States. And the Yards Company has always collected a charge on all animals received in its yards. It may be assumed that shippers, commission men and packers, including the Hygrade Company, have had knowledge of this long existing practice.

Paragraph (5) of § 15 was passed February 28, 1920, during and presumably with knowledge of the controversy later brought here in *Adams* v. *Mills, supra*. While declaring that transportation of livestock to public stockyards shall include unloading without extra charge, it left undisturbed the Yards Company's practice of making a charge for livestock received.[2] The Packers and Stockyards Act, approved August 15, 1921, subjects public stock-

---

[2] Section 15 (5) of the Interstate Commerce Act, added by § 418 of the Transportation Act, 1920, 41 Stat. 486, provides:

" Transportation wholly by railroad of ordinary livestock in carload lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee or owner, or to try an intermediate market, or to comply with quarantine regulations. The Commission may prescribe or approve just and reasonable rules governing each of such excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers now existing by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards." 49 U. S. C., § 15 (5).

yards to regulation by the Secretary of Agriculture. Section 301 (b) defines stockyards services to include, among other things, facilities furnished at a stockyard in connection with the receiving, holding and delivery of livestock.[3] Section 406 provides that the Act shall not affect the jurisdiction of the Commission or confer upon the Secretary concurrent jurisdiction over any matter within the jurisdiction of the Commission.[4]

There is here involved no question as to the adequacy of individual carriers' unloading or other facilities for the delivery of livestock. The Hygrade Company did not seek and the Commission did not grant relief upon the ground that the carriers failed to provide egress from the unloading pens in the public stockyards to the city streets by means of which consignee's animals might be removed to its plant. Consignee sought free delivery in cars switched into its plant, but the Commission found the switching charge not unreasonable. Consignee also sought free use of the Yards Company's properties, including the overhead runway to take its animals from holding pens as well as from unloading pens to its plant. The Commission held against it as to the first and in its favor as to the other of these demands.

Long continued practice and special conditions made unloading at these yards a transportation service to be performed by the carrier. *Adams* v. *Mills, supra,* 410. So the long established and uniform practice to provide a

---

[3] " The term ' stockyard services ' means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock." 7 U. S. C., § 201 (b).

[4] " Nothing in this Act shall affect the power or jurisdiction of the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission." 7 U. S. C., § 226.

route via the overhead runway to the Hygrade plant distinguishes the use of the Yards Company's properties for this service from mere egress such as is included in transportation of livestock to destinations other than public yards. Plainly there is an essential difference between the route from unloading pens to consignee's plant and a mere way out to the public highways. Transportation does not include delivery within the Hygrade plant or the furnishing of the properties, overhead runway and all, that are used for that purpose. Usage and physical conditions combined definitely to end transportation, at least in respect of these shipments, with unloading into suitable pens as is now required by § 15 (5). Like the railroads, public stockyards are public utilities subject to regulation in respect of services and charges. The statutes cited clearly disclose intention that jurisdiction of the Secretary shall not overlap that of the Commission. The boundary is the place where transportation ends.

The Commission's ruling that the imposition of the yardage charge on animals taken by consignee from holding pens does not violate the Act implies that as to those animals transportation ended at the unloading pens. On the other hand, its ruling that in the instances where consignee takes delivery at unloading pens the animals are not subject to the yardage charge suggests that delivery is not completed by unloading into suitable pens. That necessarily implies something more to be done or furnished by the carrier. But the Commission, in respect of the shipments covered by its order, made no definite finding as to what constitutes complete delivery or where transportation ends. Its report does not disclose the basic facts on which it made the challenged order. This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to

constitute a valid basis for the order. In the absence of a finding of essential basic facts, the order cannot be sustained. *Florida* v. *United States,* 282 U. S. 194, 215. Recently this court has repelled the suggestion that lack of express finding by an administrative agency may be supplied by implication. *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 433. See *Beaumont, S. L. & W. Ry.* v. *United States,* 282 U. S. 74, 86. *Interstate Commerce Comm'n* v. *Chicago, B. & Q. R. Co.,* 186 U. S. 320, 341.

*Reversed.*

MR. JUSTICE STONE, dissenting.

I think the judgment should be affirmed.

The Interstate Commerce Commission found that the stockyards are the live stock terminals of the carriers; that a "yardage charge" per animal is assessed on all shipments of live stock delivered by the carriers at the stock yards; that the charge is imposed whether the live stock is taken by the consignee directly from the unloading pens or from the holding pens, to which the animals are taken if not immediately removed by the consignee upon arrival; and that appellee removes about 15% of all shipments consigned to it directly from the unloading pens. Upon the basis of these findings the Commission concluded that the yardage charge upon live stock removed from the holding pens is proper, but that the charge is improper and unlawful when made upon live stock received by the consignee and removed immediately upon arrival from the unloading pens and the yards.

These findings are thus the complete and obvious equivalent of a finding that a charge in addition to the scheduled tariff rate is imposed on consignees, including appellee, for the bare privilege of access to the unloaded live stock for the purpose of its immediate removal from the carriers' terminal. They are ample to raise the questions of law decided below and presented here, whether

the charge is lawful and whether the Commission has jurisdiction to forbid it. The precise point in space at which delivery is complete, or where transportation ends, is immaterial. For whether it ends when the cattle are placed in the unloading pens or only when the consignee removes the live stock from the terminal, the questions remain whether a charge levied upon the privilege of removal from the carriers' terminal is lawful and whether, in any case, the Commission has jurisdiction.

It appears that appellee drives the live stock to its place of business, in part over a viaduct, belonging to the stock yards, and in part through a tunnel, the ownership of which does not appear. But the order of the Commission does not require the use of either the viaduct or the tunnel for that purpose, or forbid a charge for their use. It only forbids yardage charges "where delivery was or is taken at the unloading pens." Appellants are thus left free, after removing the condemned charge, to provide any reasonable means of free access to the stock yards terminal for the purpose of proper removal of the live stock from the unloading pens. See *Merchants Warehouse Co.* v. *United States*, 283 U. S. 501, 513; *Chicago, I. & L. Ry. Co.* v. *United States*, 270 U. S. 287, 292, 293.

In thus declaring that it is a part of the duty of a common carrier of live stock by rail to provide costless facilities for its delivery and immediate removal by the consignee on arrival at its destination, the Interstate Commerce Commission did not announce any novel rule of law. A carrier can no more lawfully add such a charge to the scheduled rate for the transportation service than it could demand a toll of a passenger, who had paid his fare, for alighting at or passing through its railway station upon arrival, or for removal of his hand bag delivered to him from its baggage car. This was specifically stated by this Court in *Covington Stock-Yards Co.* v. *Keith,* 139

U. S. 128, 135, in declaring unreasonable and unlawful any charge for delivery and prompt receipt of the live stock, made by a company whose stock yards had been designated by the rail carrier as its delivery station.

Section 1 of the Act to Regulate Commerce, as originally enacted in 1887, c. 104, 24 Stat. 379, continued this duty of common carriers by rail by providing that the charges for the transportation of passengers or property "or for the receiving, delivering, storage, or handling of such property, shall be reasonable and just." The Act, as amended, amplifies this duty by providing in § 6 (1) of the Interstate Commerce Act that rate schedules shall "state separately all terminal charges," and by § 6 (7) which prohibits rail carriers from receiving any greater or different compensation for transportation of passengers or property "or for any service in connection therewith, between the points named in such tariffs than the rates" which are specified in the filed tariff. Section 1 (3) of the Act gives to the Commission jurisdiction over "terminal facilities of every kind used or necessary in the transportation of persons or property . . . including all freight depots, yards and grounds, used or necessary in the transportation or delivery of any such property," and further provides that the term " transportation" as used in the Act shall include "all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery . . . and handling of property transported." The Commission is thus given jurisdiction over the terminal services of each carrier incidental to the transportation and delivery of freight which could in any wise affect the charges or rates for the transportation service which they undertake to render. Even storage of goods at destination is a part of the transportation service, in the sense of the federal act,

and subject to the jurisdiction of the Commission. *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632, 637; *Cleveland, C., C. & St. L. Ry. Co.* v. *Dettlebach,* 239 U. S. 588.

When Congress enacted the Packers and Stock Yards Act of 1921, c. 64, 42 Stat. 159, it gave to the Secretary of Agriculture regulatory jurisdiction over public stockyards, including specified stock yard services, but it was provided by § 406 (a) that "nothing in this Act shall affect the power or jurisdiction of the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission."

This duty of the carrier, and the jurisdiction of the Commission to compel the performance of it, were recently recognized and reaffirmed by this Court in *Adams* v. *Mills,* 286 U. S. 397, 409–415, upholding a reparation award by the Commission against the carrier and the Chicago Stock Yards for an unloading charge not absorbed by the carrier or included in its schedule of tariffs. It was held that the yards used by the carrier as a place of delivery were terminals of the railroad company regardless of their ownership, see *Merchants Warehouse Co.* v. *United States, supra,* 513, that unloading the live stock was a transportation service for which no charge could be made which was not designated in the filed tariffs, and that the Commission had jurisdiction to forbid the unlawful practice and to order reparations for the overcharge. See also *Cleveland, C., C. & St. L. Ry. Co.* v. *Dettlebach, supra; Southern Ry. Co.* v. *Prescott, supra.*

To avoid these plain provisions of the statutes of the United States, and the unambiguous definition by this Court of the duty of a rail carrier of live stock, appellants rely on an ingenious interpretation of § 15 (5) of the Interstate Commerce Act. This section, so far as now material, provides that transportation by railroad of ordinary

live stock in carloads, received at public stockyards, shall include " all necessary service of unloading and . . . delivery at public stock yards of inbound shipments into suitable pens . . . without extra charge therefor to the shipper, consignee or owner. . . ." It is said that this legislation, by requiring the carrier to deliver the live stock into suitable pens and by prohibiting any extra charge for all necessary service of unloading the live stock, has left the carriers and the stock yards company, acting together or independently, free to charge the consignee or owner a toll for the privilege of removing his live stock from the stock yard terminal of the carriers.

In view of the consistent policy of the law, and the persistent but unsuccessful efforts of carriers and stock yards to impose forbidden charges for carrier service attending the unloading and delivery of the live stock, it would seem that the words, "all necessary service of unloading and . . . delivery" of live stock at a stock yard might fairly be taken to include all those incidental services at a terminal which the carrier is bound to render for its scheduled tariff and that "suitable pens" to which the carrier must make the delivery must at least be taken to mean pens to which the consignees may gain unimpeded access for the purpose of removing their stock. But if such is not the meaning of its language, and the statute speaks only of delivery of the live stock into the pens capable of holding them, it is difficult to see upon what principle of statutory construction it can be said that the section, by forbidding one unlawful practice, sanctions another which it does not mention. Its purpose was remedial, to remove an old evil, and not to sanction a crop of new ones by giving stock yards and rail carriers of live stock *carte blanche* to impose vexatious charges which for more than thirty years had been condemned by this Court as unlawful.

The section was added by way of amendment to the bill which became the Transportation Act of 1920, c. 91, 41 Stat. 456, in consequence of representations made to the Committee on Interstate and Foreign Commerce of the House in behalf of the American National Live Stock Association and the National Live Stock Shippers League. See 59 Cong. Rec. 674. Their representative made bitter complaint of the practices of carriers and stock yards, in adding terminal charges to the scheduled carrier rates, so that shippers could not know in advance the cost of the complete transportation service involved in taking live stock from the point of shipment into the hands of the consignee ready to receive it at point of delivery. The resolution of the Associations asked the enactment, as a part of the Interstate Commerce Act, of the rule of the *Covington Stock-Yards* case, and specifically "that there be one through rate on live stock for the whole services from point of origin to the destination at public stock-yards . . . which shall include unloading into suitable pens and delivery therein at such stock yards . . . including such facilities as are necessary or in use for making such delivery." See Hearings before the Committee on Interstate and Foreign Commerce on H. R. 4378, House of Representatives, 66th Cong., 1st Sess., pp. 139, 141, 874, 875, 881.

In introducing the amendment in the Senate, Senator Cummins, Chairman of the Interstate Commerce Committee, referred to the request of the Live Stock Association in emphasizing the purpose of the amendment, which he stated was to require the series of services rendered in connection with the transportation to be performed for a single scheduled rate. 59 Cong. Rec. 674. On the coming in of the conference report on the bill recommending it in its final form, the House Managers made a statement that the purpose of the amendment was to provide that

208

the "through rates on live stock should include unloading and other incidental charges." 59 Cong. Rec. 3264. The legislative history from beginning to end indicates unmistakably the single purpose to give the Commission authority to remove the very abuses described and forbidden by the Court in the *Covington Stock-Yards* case. It would be an incongruous result of this legislation if, by forbidding an unlawful charge for putting the live stock into the unloading pens, it had made lawful the same charge for taking it out, and had thus condemned the aggrieved shippers and consignees to the limbo from which they were earnestly striving to escape. An interpretation of a statute leading to an absurd result is to be avoided where reasonably possible, as it plainly is here. See *United States* v. *Katz*, 271 U. S. 354, 357; *Hawaii* v. *Mankichi*, 190 U. S. 197, 212.

It is true that yardage charges have been imposed by the appellant stock yard for many years. But, as already indicated, the Commission found that the charge is lawful when the live stock is removed from the unloading to the holding pens, as is done with most shipments. It does not appear how long and how extensively the charge has been applied to live stock immediately removed from the unloading pens by the consignees. In any case, long continuance of an unlawful practice can neither excuse nor sanction it. See *Merchants Warehouse Co.* v. *United States, supra,* 511; *Louisville & Nashville R. Co.* v. *United States,* 282 U. S. 740, 759; *American Express Co.* v. *United States,* 212 U. S. 522; *Los Angeles Switching Case,* 234 U. S. 294, 312, 313. I think that the Commission was right in forbidding the yardage charge as applied to live stock taken by the consignee from the unloading pens, and that its order should be left undisturbed.

In the present state of the case it is unnecessary to consider whether the reparations part of the order was rightly

directed to both the stock yards and the carriers, or should have been directed to the carriers alone.

MR. JUSTICE BRANDEIS and MR. JUSTICE CARDOZO join in this opinion.