[No. 28041. *En Banc.* December 30, 1940.]

THE STATE OF WASHINGTON, *on the Relation of W. J. Bohon et al., Appellants,* v. THE DEPARTMENT OF PUBLIC SERVICE *et al., Respondents.*[1]

[1]Reported in 108 P. (2d) 663.

*J. N. Davis, Thos. H. Maguire, R. S. Macfarlane, Dean H. Eastman,* and *Earl F. Requa (Carey, Hart, Spencer & McCulloch, Fletcher Rockwood, Roy F. Shields,* and *L. W. Hobbs,* of counsel), for appellants.

*The Attorney General, Don Cary Smith, Assistant,* and *Will M. Derig,* for respondent Department of Public Service.

*H. C. Brodie (Charles W. Robison* and *William B. Adams,* of counsel), for respondents Northwest Petroleum Transporters *et al.*

*Johnston B. Campbell,* for respondents Inland Empire Waterways Association *et al.*

*Harry Ellsworth Foster, amicus curiae.*

STEINERT, J.—This is an appeal from a judgment of the superior court for Thurston county affirming an order of the department of public service of Washington, entered, as amended, on November 8, 1939.

The departmental order in question directed the cancellation of certain rate schedules filed by a group of railroad companies through their tariff publishing agency, North Pacific Coast Freight Bureau, in which schedules the railroad companies had designated reduced rates for the transportation by rail of bulk

petroleum products from marine terminals at Vancouver, Washington, and Puget sound ports to points in Washington east of the Cascade mountains. The departmental order also fixed certain rates as the "minimum reasonable rates" to be charged by common carriers, whether railroads or motor vehicles, for transportation of such products between the points named. Bulk petroleum products to which the rates as established applied emanated from California.

Prior to July, 1937, the rate for bulk petroleum products shipped from Seattle to Spokane was forty-five cents per one hundred pounds, and for similar products shipped from Attalia, which is located on the Columbia river in Walla Walla county, to Spokane was twenty-eight cents per one hundred pounds. In December, 1937, following a cooperative hearing by the interstate commerce commission and the state department of public service, the Seattle-Spokane rate was reduced from forty-five cents to thirty-seven cents, but the Attalia-Spokane rate remained as before. In April, 1938, pursuant to a request of the railroad companies for a blanket fifteen per cent raise in rates, the interstate commerce commission and the state department each issued an order allowing a ten per cent raise, with the result that the Seattle-Spokane rate was increased from thirty-seven cents to forty-one cents, and the Attalia-Spokane rate was increased from twenty-eight cents to thirty-one cents.

In the meantime, that is, during 1938 and 1939, the producers of oil in Montana began seeking a market in the Pacific Northwest, and, as a result, the California oil companies were faced with their first serious competition in that very lucrative field, particularly in the "Inland Empire," in eastern Washington. The question of rates, therefore, became a very important consideration to the California companies in the

struggle which appeared to be imminent between them and the Montana oil producers. As a consequence, the southern oil companies contrived a plan for moving their products by barge up the Columbia river to Umatilla, Oregon, and to Attalia, Washington, at both of which points they erected extensive storage facilities. From those points, their products were transported to Spokane and the surrounding territory by motor trucks operating as common carriers. That arrangement apparently secured, or was intended ultimately to secure, for the southern oil companies a cheaper rate than that previously provided by the railroad companies for transportation of petroleum products from the western terminals at Portland, Vancouver, and Seattle, to Spokane and other points in eastern Washington, and to that extent fortified, or was intended ultimately to fortify, the California oil companies against the competition of Montana oil. To that same extent, however, the railroad companies apparently foresaw, or became apprehensive, not only that they would have serious competition for the business of transporting such products from the west coast terminals to Spokane, but also that in time they might lose that business entirely.

Whatever may have been the inciting cause, the fact is that, on March 7, 1939, the railroad companies filed revised rate schedules which provided that the rates for the transportation of bulk petroleum products between designated points in western and eastern Washington be reduced from forty-one cents per one hundred pounds to twenty-five cents per one hundred pounds.

Acting upon the complaints of various interested parties, the department of public service, on March 23, 1939, entered an order suspending the proposed rates and directing that the matter be set for investigation

and hearing. On March 25, 1939, the department petitioned the interstate commerce commission to take similar action with respect to the proposed reduction in the same rate schedules of interstate rates between marine terminals in the state of Oregon and points in eastern Washington.

From June 15 to June 28, 1939, joint hearings were held by the interstate commerce commission, the department of public service of Washington, and the public utilities commissioner of Oregon, at which hearings the regulatory authorities of Idaho and Montana were present and cooperated.

On September 25, 1939, the interstate commerce commission issued its order directing the cancellation of the suspended schedules, without prejudice to the establishment of an interstate rate from Portland to Spokane of twenty-eight and one-half cents per one hundred pounds, and indicating that the same rate should apply from Seattle to Spokane. In that order, rates were also prescribed for transportation of petroleum products from northern Montana to eastern Washington.

On November 6, 1939, the state department of public service issued the order here involved, which, as amended on November 8, 1939, directed the cancellation of the proposed rates for *intrastate* transportation, and fixed minimum rates for the future.

Upon petition, in which all but one of the railroad companies joined, a writ of review was issued by the superior court for Thurston county, and, upon certification of the department's record, hearing was had in that court on January 4 and 5, 1940. Thereafter, on February 21, 1940, the superior court filed its memorandum opinion, upholding the departmental order. A motion for judgment notwithstanding the memorandum opinion and, in the alternative, for a new trial,

was denied, and from the judgment finally entered in the superior court, this appeal was taken.

Appellants make three principal contentions. The first contention is that, in the proceedings here under review, the department did not acquire jurisdiction, and therefore had no power, to fix minimum rates for the future. This contention is made upon the alleged ground that appellants were not given notice that the question of *minimum rates* was to be considered at the proposed hearing. Appellants' position in this respect is that there was nothing in the order of suspension, or in the notice of hearing which the department issued, or in any complaint or other pleading filed with the department in the instant proceedings, which would tend to raise any issue other than whether the specific rates proposed by appellants should be permitted to become effective or should be cancelled. The extent of appellants' claim upon the immediate point under consideration is best expressed by a quotation from their reply brief, as follows:

"Our contention is simply this: That the department in its order of suspension merely indicated that the sole issue before it would be whether the proposed rates were 'substantiated by costs of operation'. If the department had intended to consider other matters such as the question of fixing minimum rates for the future, it could have done so by stating in its order of suspension or notice of hearing that such matters would be considered in this proceeding. We do not claim that the department absolutely lacks power to set minimum rates for the future, but on the contrary our contention is simply that if the department intends to consider and decide such matters proper notice should be given to all interested parties. No matter what jurisdiction the department may have under proper circumstances such jurisdiction cannot be exercised without proper notice to the parties. Examination of the record in this case clearly discloses that no such notice was given."

The question, then, with which we are presently concerned, is not whether the department has power, generally, to fix minimum rates for the future, but, rather, whether appellants had *notice* of the intention of the department to exercise that power.

That the department of public service is limited to the hearing and the determination of those issues only which are raised by the pleadings, is well settled in this jurisdiction. *State ex rel. Great Northern R. Co. v. Railroad Commission,* 47 Wash. 627, 92 Pac. 457; *State ex rel. Northern Pac. R. Co. v. Railroad Commission,* 52 Wash. 440, 100 Pac. 987; *Northern Pacific Public Service Co. v. Kuykendall,* 127 Wash. 73, 219 Pac. 834. The procedure for such hearings is prescribed by Rem. Rev. Stat., §§ 10389, 10422, and 10423 [P. C. §§ 5580, 5607, 5608], and Rem. Rev. Stat. (Sup.), § 10424 [P. C. § 5609].

The purpose of the rule just stated is, of course, to insure to the carriers or utilities affected full opportunity to be heard upon any matter before any ruling is made.

The order of suspension, entered by the department of public service on March 23, 1939, recited that the department had theretofore, on March 7, 1939, held a general investigation of rates on petroleum products fixed by motor vehicle common carriers; that, pursuant to such hearing, rates had been established for the transportation of such products by trucks operating from Puget sound terminals, Attalia, and Spokane, to destinations east of the Cascade mountains; that the rates thus established were in most instances higher than appellants' proposed rates; that, since December 13, 1937, rates for the transportation of petroleum products by truck and by rail lines had been on an exact parity; and that it had been the policy of the

department, determined after full investigation, that such parity should exist. The order then recited:

"Considering the above, together with the fact that truck lines were required to submit detailed cost figures, it would be unfair to allow those new rail rates [proposed by appellants] to become effective until such time as they are substantiated by costs of operation. Protests have been received from several truck operators in which they state that if they were forced to meet the proposed rates they would not be able to continue operation. We, therefore, find that the rates published [by appellants] in Supplement No. 5 should be suspended and the matter set for hearing."

Although the suspension order did not in so many words state that the question of minimum rates to be charged by the railroads in the future was to be considered or decided at the proposed hearing, we are nevertheless of the opinion that the order was sufficiently comprehensive to include that very issue, and sufficiently informative to put the railroad companies on notice that the question of such minimum rates was to be presented and adjudicated in that hearing.

It will be recalled that appellants' purpose, at the joint hearing in June, 1939, was to justify a reduction in the rate on bulk petroleum products from forty-one cents to twenty-five cents per one hundred pounds. Appellants had full opportunity, and utilized that opportunity, to be heard on that question. Any attempt by appellants, however, to justify the twenty-five cent rate necessarily involved a negation by them of the claim that *any* higher rate was justified or required. In other words, the reasonableness of *any* higher rate was clearly within the issues.

Furthermore, when a carrier requests a rate reduction, a reasonable construction of the request is that the carrier desires the establishment of the requested rate, or else of a rate which will be as near the re-

quested rate as possible. Likewise, a reasonable construction of the departmental notice of hearing is that, if the requested reduction could not be granted, the department would consider and grant as great a reduction as it deemed proper.

Appellants' argument to the contrary would lead to an anomalous situation. Under their contention, the refusal by the department to grant the twenty-five cent rate would leave the railroads with the sole alternative of charging the former forty-one cent rate. That, of course, is the very thing they are now trying to escape. To obtain relief from that situation, the railroads would be required to file a schedule naming a rate somewhat in excess of the twenty-five cent rate, as, for instance, a twenty-six cent rate. The department would then again be compelled to suspend the latter rate, hold a hearing, and ultimately deny the request. That process would necessarily have to be repeated, resembling a game of battledore and shuttlecock, until the railroad happened to propose the exact rate which the department considered reasonable. The result would be a multiplicity of proceedings, innumerable delays, pyramiding of expense, and a general confusion in the business of transporting petroleum products. We do not believe that any such interpretation or limitation should be placed upon the power of the department with respect to such hearings.

We are convinced, and therefore hold, that, upon the notice as given, the department had authority, in the proceeding then before it, to consider and pass upon the question of minimum rates to be charged by appellants in the future.

Appellants' second contention is that the department has no power at all to condemn rates as unreasonably low unless such rates are insufficient to yield "a reasonable compensation for the services rendered."

This contention is made on the ground that the department in its "opinion and findings of fact," which we will consider more in detail later herein, indicated that, in arriving at its conclusion, the department had taken into consideration not only "the cost to the carrier of rendering service," but also the effect of such rates upon other kinds of carriers of the same products, and the necessity of maintaining highway, as well as rail, transportation in this state.

The department concedes that appellants' contention, as expressed above, correctly states the law, but it insists that appellants have in their brief employed the term "compensatory" in the narrow sense of a return or repayment for "out-of-pocket" costs, whereas, according to the department, the true meaning of the phrase "reasonable compensation for the service rendered," as used in Rem. Rev. Stat., § 10389 . [P. C. § 5580], includes a fair margin of profit over and above the cost of the service. The intervening respondents, however, consisting of certain truck operators, truck-driver unions, a navigation company, and a waterways association, dispute appellants' contention and assert that, since the public interest is here involved, the department, in establishing a minimum rate, had the right to take into consideration the effect of appellants' proposed rates upon other competing kinds of transportation, such as truck and river transportation. The question thus presented raises a very serious issue, one that may, in the final analysis, be determinative of this case. However, for reasons which will presently appear, we cannot, and will not, decide that question at this time.

■ Appellants' third contention is that the findings made by the department are improper, and are insufficient to sustain its order canceling the proposed rates and fixing minimum rates.

Rem. Rev. Stat., § 10423, provides that, at the conclusion of its hearing, the department shall make and render findings concerning the subject matter and facts inquired into, and shall enter its order based thereon. This court has in recent years very emphatically expressed itself concerning the necessity, in cases such as this, for findings of fact which shall be direct, certain, and sufficiently clear that no misunderstanding as to their meaning will arise, and also concerning the functions of the court in considering the findings and the supporting or militating evidence. The language which we are about to quote from one of our former decisions can be applied almost literally to the "opinion and findings of fact" in the proceeding now before us.

"Before passing to the questions in controversy on the appeal, we feel impelled to call attention to the indefiniteness and uncertainty of the findings of fact made by the department. The statute (Rem. Comp. Stat., § 10423) requires the department, at the conclusion of the hearing, to 'make and render findings concerning the subject-matter and facts inquired into.' This contemplates a statement of the facts found in direct and certain language, sufficiently clear as to leave no misunderstanding as to their meaning and purport. The findings in this instance are not thus direct and certain. Many of them are preceded by such phrases as 'complainant alleges,' 'complainant's witnesses allege,' 'complainant also points out,' 'it was stated,' 'respondent submits,' 'respondent by its witnesses and in its brief argues,' 'testimony submitted by complainant indicates;' and the like, leaving it uncertain whether the department intended to affirm or disaffirm the matters contained in the recitals following the phrases, or intended the matters merely as argument in support of the conclusions reached. It is not objectionable, of course, that the department state the contentions of the parties or arguments used by them which it conceives support, or militate against, the facts as found by it, but, if uncertainty is to be avoided, these should

be separately stated, and not confused one with the other in the findings.

"On the merits of the controversy, the question for review is whether the rate fixed by the department for transporting the commodity mentioned between the places named, is, to paraphrase the language of the statute, just and reasonable. In determining the question, the courts are empowered to inquire, first, whether the facts as found by the department are sufficient, in themselves, to justify its order, and, second, if it finds that they are thus sufficient, to inquire whether there is any substantial evidence on which the findings can be based. . . .

"The learned counsel for the complainant contends that the evidence introduced at the hearing supports the order of the department, and that the court may, if it so concludes, disregard the findings made by the department, and affirm its order, merely because it is so supported. But this contention mistakes the functions of the court. The power to fix the rates of a common carrier is a legislative power, and the court's power is limited to the inquiry whether the findings and conclusions of the body to which the power is delegated, are justified by the record it makes. The rule can be no better stated than it is stated in a recent decision of the supreme court of the United States (*Florida v. United States,* 51 Sup. Ct. 119, not yet officially reported [282 U. S. 194, 75 L. Ed. 291, 51 S. Ct. 119]), wherein it is said:

" 'The question is not merely one of the absence of elaboration or of a suitably complete statement of the grounds of the commission's determination, to the importance of which this court has recently adverted (*The Beaumont, Sour Lake & Western Railway Company v. United States,* decided November 24, 1930, 282 U. S. —— [282 U. S. 74, 75 L. Ed. 221, 51 S. Ct. 1]), but of the lack of the basic or essential findings required to support the commission's order. In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit. The Commission is the fact-finding body and the Court examines the evidence not

to make findings for the Commission but to ascertain whether its findings are properly supported.' " *Great Northern R. Co. v. Department of Public Works,* 161 Wash. 29, 296 Pac. 142.

See, also, to the same effect: *State ex rel. Puget Sound Power & Light Co. v. Department of Public Works,* 181 Wash. 105, 42 P. (2d) 424; *United States v. Chicago, Milwaukee, St. P. & P. R. Co.,* 294 U. S. 499, 79 L. Ed. 1023, 55 S. Ct. 462; *Atchison, Topeka & Santa Fe R. Co. v. United States,* 295 U. S. 193, 79 L. Ed. 1382, 55 S. Ct. 748.

In view of the fact that we now affirm and emphasize the position taken by this court in the *Great Northern* case, *supra,* from which case we have extensively quoted, and inasmuch as our disposition of the present appeal is rested upon the question of the sufficiency or insufficiency of the findings, we feel that it is incumbent upon us to advert at some length to those "findings," even though this opinion may be unduly extended thereby.

The document labeled "opinion and findings of fact," filed by the department, commences with the recital of the preliminary proceedings beginning March 7, 1939, and eventuating in the joint hearing held by the department of public service and the interstate commerce commission beginning June 15, 1939. Reference is then made to the fact that, on September 25, 1939, the interstate commerce commission released its order in the joint hearing. Certain comments upon that order are then made, but they have no bearing upon the present issues. The findings then continue:

"The commission [I. C. C.] found that the proposed reduced interstate rail rates from Portland to Spokane and intermediate points were unreasonably low, and hence unlawful and ordered that the suspended schedules be canceled without prejudice to the establishment of rates based on a constructive river rate of 9 cents to

Umatilla, Oregon, plus ½ cent for incidental charges, and approved truck rates beyond.

"Apparently, what the commission meant by 'approved truck rates beyond' were those which it prescribed in Docket M-737 . . .

"The effect of these findings [by I. C. C.] is definitely to establish the rate from Portland to Spokane at 28½ cents."

Then, after a reference to a finding by the interstate commerce commission with respect to proposed rail rate reductions from points in northern Montana to Spokane and adjacent territory, the following statement appears:

"It is clear from the commission's report and order that it desires the rates from Portland and the Puget Sound ports to Spokane and neighboring competitive territory to be the same."

The findings then recite that "the situation regarding the transportation of petroleum products in the Pacific Northwest had radically changed during the past few years;" that, whereas petroleum products from California had formerly been transported from Portland and Puget sound ports by rail, a movement was started in 1937 to have such products carried by barge up the Columbia river from Portland to Attalia, Washington, where storage facilities were erected, and thence by truck to Spokane and throughout the Inland Empire; and that, owing to serious competition provided by Montana oil producers, the California companies had encouraged the river-truck movement, and had begun to bring pressure upon carriers to reduce rates from north coast points.

It is then stated that the competition of Montana oil and the development of river-truck transportation "have created extremely involved transportation situations." And, following that, it is pointed out as being evident that any disparity in rates between the

various kinds of carriers would have a fatal effect upon one or another of such carriers, or upon one or another of the oil producers and refineries. We quote, directly, the next recitals, as follows:

"The general policy to be followed by the Department in establishing transportation rates is laid down by our statutes and numerous court decisions. We are to use the rate-making authority so as to encourage, foster and maintain adequate transportation facilities of every kind at the lowest possible cost to shippers and the general public. We are to give effect to natural transportation advantages where they exist and at the same time foster healthy competition between different kinds of carriers. . . . Necessarily, the cost to the carrier of rendering service is a very important factor in the rate-making process and it should control the general level of rates. Generally it is impossible to determine with fine exactness the true cost involved in any particular movement, and in such instances any one or several of the other well-recognized principles of rate-making may control."

Reference is then made to the desirability of maintaining for the people the natural advantages of river, rail, and highway transportation, and of preventing the elimination of competition in the vital petroleum business. This statement then follows:

"All of these considerations have played a part in guiding us towards the conclusions reached in this case."

The findings then continue with a reference to certain evidence submitted by appellants as to the cost of transporting petroleum products in tank cars, which evidence is challenged as being quite different from that offered in "hearings and in other cases where the goal sought was increases in rates." Then, after expressing doubt that rail costs should be a "determining factor," the findings recite: "yet we have used the costs presented as one of our guides."

Cost studies made by the department, and intro-
duced as exhibits at the hearing, are next discussed
in a general way, and that phase of the "opinion and
findings" concludes with the following statement:

"It is impossible to find in the record clear and con-
vincing evidence of what it is going to cost the Cali-
fornia companies to have their products moved up the
river to Attalia and Umatilla and from there distrib-
uted to the Inland Empire markets."

The sentence just quoted is followed by a discussion
of the testimony relative to the river rates and of the
probable basis upon which the interstate commerce
commission arrived at a 28½ cent rate for all-rail and
all-truck transportation from north-coast points to
Spokane; in that discussion, however, it is suggested
that actual experience of the past several months
would furnish more reliable data.

"A few examples" are next given of the "many very
involved and intricate problems which arise when an
attempt is made to name the hundreds of individual
rates involved in this proceeding," after which the
following statements are made:

"One phase of the Umatilla-Attalia situation merits
special consideration. Unquestionably, the interstate
commerce commission intended that the rates from
Attalia and Umatilla into destination territory would
be the same. We, however, cannot overlook the fact
that Attalia is twenty-seven miles farther up the river
than Umatilla and that this stretch of water is the most
difficult and hazardous to navigate and represents
costs entirely out of proportion to the mileage. If the
local rates from Attalia and Umatilla are the same to
all Washington points, the result might well be the
complete abandonment of the Attalia facilities. We do
not favor such artificial interference with the natural
advantages of the several river ports.

"It is generally recognized that the conditions with
which we are dealing in these proceedings were not
definitely settled when the record was closed, and are

still changing. What appears to be the proper solu-
tion today may have to be changed tomorrow. The
department should retain jurisdiction in these proceed-
ings so that they may be reopened and further evi-
dence be taken at any time conditions warrant or re-
quire such action."

The decision of the department then concludes as
follows:

"After giving due consideration to all of the facts
in the record and to well recognized rate-making
factors such as cost of rendering service, relationships
between communities, natural advantages of various
types of transportation, and all of the other pertinent
facts and circumstances developed in these extended
hearings and being fully advised in the premises we
make and enter the following specific findings:

"(1) We find that the rates named on bulk petro-
leum products as described and set forth in appendix
'A,' attached hereto, should be the minimum reason-
able rates for both railroads and motor vehicle car-
riers between the points named and that such rates
should be made subject to the rules set forth therein.

"(2) We further find that in cases where the pres-
ent effective railroad rates are lower than those set
forth in appendix 'A,' the involved rail lines should be
required to correct their tariffs by naming rates which
are either the same or higher than those set forth in
appendix 'A' and that such changes should be made on
statutory notice and become effective not later than
January 10, 1940.

"(3) We further find that department of public
service tariff No. 7 should be corrected on statutory
notice by naming point-to-point rates set forth in ap-
pendix 'A', such rates to become effective January 10,
1940.

"(4) We further find that supplements 5 and 6 to
W. J. Bohon tariff No. 14-N, W. D. P. S. No. 535, should
be cancelled as of November 9, 1939, and that per-
mission should be granted to file such cancellation
supplement on one day's notice.

"(5) We further find that the original order in

F. H. 7223 should be vacated and set aside in so far as it fixes rates.

"(6)  We further find that we should retain jurisdiction in these proceedings.

"Based upon the above and foregoing Opinion and Findings of Fact, the department now makes and enters the following order.

"ORDER"

[Here follow six paragraphs which are identical with the six preceding "specific findings," except that instead of the phrases "We find that," and "We further find that," the expressions "IT IS ORDERED" and "IT IS FURTHER ORDERED" are used.]

As indicated by its title and by its contents, the written decision of the department is divisible into three component parts, the "opinion," the "specific findings," and the "order."

The "opinion" is a long, discursive narration of the conditions and events leading up to the present proceeding, and of the action taken by the interstate commerce commission.  While the tenor of the opinion strongly suggests that the final decision of the department is based, in part, on the rates which competitive lines of transportation are compelled to charge in order to continue in business, the "opinion" does not definitely and clearly say so.  Moreover, while the "opinion" refers in a general way to "well recognized rate-making factors" and recites, further, that "due consideration to all of the facts in the record" has been given, there is nothing stated therein, by way of positive findings, with reference to the specific "factors" or the actual facts upon which the order is based.

Although it is not objectionable, and in some instances may be very helpful, to have the "opinion" of the department state the contentions of the parties, the existing conditions, and a summary of the evidence, nevertheless, the facts as actually found should be clearly and definitely stated so that no uncertainty

thereon shall exist. That is the function, however, of the department, not of this court.

Turning to the "specific findings," following the "opinion," we discover that the department has gone to the opposite extreme. While those findings are condensed into succinct statements, they amount to nothing more than ultimate conclusions drawn from the preceding general narrative. They are phrased in language practically identical with, and having the same legal effect as, the concluding "order."

Findings of fact by an administrative agency are subject to the same requirement as are findings of fact drawn by a trial court. *Wichita Railroad & Light Co. v. Public Utilities Commission,* 260 U. S. 48, 67 L. Ed. 124, 43 S. Ct. 51; *Beaumont, Sour Lake & Western R. Co. v. United States,* 282 U. S. 74, 75 L. Ed. 221, 51 S. Ct. 1. The findings must contain ultimate facts; mere statements of legal conclusions will render the findings insufficient. *Kennedy v. Derrickson,* 5 Wash. 289, 31 Pac. 766.

The intervening respondents rely largely on their contention that the findings of the department adopted the findings of the interstate commerce commission, and that therefore the latter findings should be incorporated by reference into the findings in the instant proceeding. We cannot agree with that contention. Reference by the department to the findings of the interstate commerce commission was made only in a general, narrative way, and there is no statement in the decision of the department which either says or directly indicates that the department was adopting the findings of the interstate commerce commission. Furthermore, as already shown, the "opinion" indicates that the department was *not* adopting certain portions of the findings of the interstate commerce commission. It is also significant that the "opinion" of the depart-

ment expresses doubt concerning the actual transportation costs of the competitive river-truck lines, and suggests that, if testimony could be taken with reference to actual experience during recent months, more reliable data would be furnished. And, finally, there is, in any event, no finding as to costs of all-rail transportation. As said before, the purported findings are, at best, but general conclusions drawn from an indefinite, uncertain, undeterminative narration of general conditions and events.

Our disposition of the question of the sufficiency of the department's findings, makes it impossible, as we have heretofore stated, to consider appellants' second contention, above noted, wherein appellants take the position that the department proceeded upon a fundamentally wrong theory in establishing minimum rates. The findings of fact being insufficient, the theory, or the factors, upon which the department based its order is unknown to this court; and, regardless of what the proper rate-making theory may be held to be, there is at this time no sufficient basis in the record for holding that the department did, or did not, act properly. A review of the testimony and of the question of whether or not the department proceeded upon a fundamentally wrong theory must therefore await the preparation of findings which will inform this court of the ultimate facts upon which the department based its conclusions, especially in view of the statutory rule that the department's findings are to be considered as *prima facie* correct. (Rem. Rev. Stat., § 10449 [P. C. § 5627].)

For the reasons given, the judgment is reversed, with direction to the trial court to remand the proceedings to the department of public service for the preparation of proper findings upon the record as al-

ready made, or to be further made, if required, in that department.

MAIN, BEALS, MILLARD, ROBINSON, SIMPSON, JEFFERS, and DRIVER, JJ., concur.

BLAKE, C. J. (dissenting)—I think the findings made by the department were sufficient to meet the requirements of Rem. Rev. Stat., § 10423 [P. C. § 5608], and are quite specific enough to apprise this court of the grounds upon which the order was based—specific enough, at least, to warrant the court in meeting and deciding the real question in the case: whether the department has power to condemn rates as unreasonably low unless such rates are insufficient to yield a reasonable compensation for the services rendered. I therefore dissent.

[1]Reported in 108 P. (2d) 641.